THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MANUEL V. CONTRERAS, Defendant-Appellant.

Second District    No. 2—91—1135

Opinion filed June 28, 1993.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, and Theodore G. Gailan, of Wheaton, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

After a jury trial, defendant, Manuel V. Contreras, was convicted of two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(a)(5)), and one count each of aggravated battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(b)(10)), home invasion (Ill. Rev. Stat. 1991, ch. 38, par. 12—11(a)), residential burglary (Ill. Rev. Stat. 1991, ch. 38, par. 19—3(a)) and robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18—1(a)). The trial court sentenced him to 120 years' imprisonment. Defendant raises two issues on appeal. First, defendant contends he should be granted a new trial because the statistical analysis of the State's serology expert was flawed. Second, defendant argues he should be granted a new trial because the trial court improperly admitted evidence of other crimes which caused substantial prejudice to defendant's case. We affirm.

Defendant was initially charged by a 15-count indictment alleging multiple counts of aggravated criminal sexual assault, home invasion, residential burglary, aggravated battery and robbery. Seven counts

arose from an incident involving complainants, E.A. and H.A., occurring on July 3, 1988. The remaining eight counts involved another incident, again involving complainants, E.A. and H.A., occurring on July 20, 1988.

Prior to trial, defendant filed a motion to sever for purposes of trial the charges arising out of the July 3, 1988, incident from those arising out of the July 20, 1988, incident. The trial court granted defendant's motion to sever. The State elected to try the charges arising out of the July 3, 1988, incident first. The trial court granted the State's request to present evidence involving the incident on July 20, 1988, for the purpose of identification of defendant, provided the State lay a proper foundation.

Defendant also filed a motion *in limine* to bar all prosecution testimony relating to statistical probabilities generated by Analytical Genetic Testing Center (AGTC) personnel arguing the statistical probability calculations generated by AGTC personnel were irrelevant and highly prejudicial to defendant. The trial court denied the motion subject to the State laying the proper foundation for the admission of the statistical evidence.

Immediately prior to trial, defendant requested the State make an offer of proof regarding the evidence it proposed to present arising out of the July 20, 1988, incident. The State responded that it intended to present evidence of "other crimes" for the limited purpose of identifying defendant as the perpetrator of the July 3, 1988, offenses. The State noted that the two incidents were almost identical except for the point of entry into the home of the complainants. On July 3, 1988, the perpetrator entered through a side window. On July 20, 1988, the perpetrator entered through the front door of the house.

In addition, the State claimed E.A. would testify that during the July 20, 1988, incident defendant berated her for calling the police after the July 3, 1988, incident, establishing defendant committed both offenses. The State also claimed that both E.A. and H.A. would testify that they recognized the voice of the offender on July 20, 1988, as the same voice they heard during the attack on July 3, 1988.

Also, the State claimed it would present forensic testimony that the semen stain on E.A.'s bed sheets from July 20, 1988, had the same rare genetic variant as did the semen stain found on E.A.'s sheets after the July 3, 1988, attack. In addition, a hair was collected from the vaginal vault of E.A. during the course of medical treatment after the July 20, 1988, attack. That hair was compared to defendant's pubic hair standards and found to be microscopically similar. Lastly, the State claimed defendant's former sister-in-law, Diane Con-

treras, would testify that defendant asked her to provide him with an alibi for July 20, 1988.

The trial court found, considering all the evidence together, it was permissible to present evidence from the other offense for the limited purpose of identification only. The cause proceeded to trial. The testimony was as follows.

Both E.A. and H.A. testified they were married and resided in a home in Downers Grove, Illinois. At the time of the offenses, E.A. was 74 years old and H.A. was in his eighties. On the night of July 2, 1988, E.A. slept in a bedroom, and H.A. slept on a couch in the living room. Sometime during the early morning hours, E.A. was awakened by a noise and discovered defendant in the house. H.A. awakened shortly thereafter by the sound of voices coming from the bedroom. As he entered the bedroom, he was grabbed by defendant and thrown to the floor.

Defendant told the complainants to take off their clothes and they complied. Defendant then told H.A. to get into the bed and face the wall. While E.A.'s husband lay next to her in bed, defendant raped E.A. and had her perform oral sex. After she started choking, he removed his penis from her mouth. Neither E.A. nor H.A. got a good look at defendant because most of the time he held a pillow over E.A.'s face and, but for a fleeting moment, did not give H.A. the opportunity to view him. Defendant told them if they called the police he would kill them. H.A. stated that although defendant spoke English, he had a Mexican accent. Before defendant left, he demanded money. He took approximately $1,000 from E.A.'s pocketbook. Complainants called the police and were eventually taken to the hospital.

Complainants did not return to their home for a couple of weeks. Upon their return, they and their sons installed an alarm system which could be operated from the bedroom, bolted down the windows, installed an air conditioner and put a timer on an outside light.

In the early morning hours of July 20, 1988, E.A. was again asleep in the bedroom while her husband, H.A., slept in the living room when defendant kicked in their front door and entered their home. He grabbed H.A. by the throat and began strangling him. H.A. stated it was the "same guy" that entered their home on July 3, 1988. The two men began struggling. H.A. bit defendant on the finger. Defendant blackened H.A.'s eyes, knocked out his teeth and bit his finger.

Defendant went into the bedroom where E.A. had triggered the alarm and shut it off. Defendant ordered complainants to get into the bed. Again, H.A. was ordered to face the wall while defendant raped

E.A. H.A. recalled defendant making the statement, "You MF's didn't think I would come back again." Although E.A. could not recall much of what happened that second time, H.A. stated it was a "repeat of the first time," except defendant did not have oral sex with E.A. Before leaving, defendant dumped the contents of E.A.'s pocketbook on the bed and took approximately $20. E.A. stated that although she did not get a good look at him, it was definitely the same man that had attacked her previously. Again, after calling the police, the complainants went to the hospital. At trial, H.A. stated he and his wife had lived in that house for 53 years, but because they did not want to go through that again, they sold the house and now live in a secured apartment.

Good Samaritan Hospital emergency room nurse Frannie Whitlock testified that she assisted Dr. John Dymowski in attending E.A. when E.A. arrived at the hospital on July 3, 1988. The parties stipulated that, if called to testify, Dr. Dymowski would state that he collected blood, vaginal swabs, vaginal smears and head and pubic hairs from E.A. and that he observed vaginal bleeding and rectal tenderness.

Ms. Whitlock was also working in the emergency room on July 20, 1988, when E.A. was brought in. E.A. told Ms. Whitlock that she had been raped, vaginally, orally and rectally, and that the perpetrator struck her on her arms with his fists. Ms. Whitlock noticed an abrasion on her right arm. Ms. Whitlock assisted attending physician Dr. John Nowak. The parties stipulated that if Dr. Nowak were called to testify, he would state that on July 20, 1988, he collected blood, vaginal swabs, vaginal smears, and head and pubic hairs from E.A. In addition, he would testify that he observed vaginal bleeding, rectal tenderness and redness in the hymen area and that he removed a black hair from E.A.'s vaginal vault and placed it into an evidence vial.

Deputy Sheriff Ronald Kerstein and Detective Michael Panacchia of the Du Page County sheriff's office testified that they determined on July 3, 1988, the house was entered via a west rear window. Detective Panacchia also stated that he lifted a latent palm print from the sill of the window used for entry. At the time of the offenses, Stephen Dahl was employed as a deputy sheriff's patrolman with the Du Page County sheriff's office. He testified that on July 3, 1988, he photographed the scene and collected the sheets off of the bed for use as evidence. Detective Gregory Figiel of the Du Page County sheriff's office testified that he was involved in the investigation of the incident on July 20, 1988. He removed the bed sheets that were on the bed at the time of the attack and placed them into evidence.

Latent fingerprint examiner Detective Raymond Wojcik, of the Du Page County sheriff's office, testified that he compared the latent palm print lifted from the window sill at the point of entry into complainants' home with a standard print from defendant. He found 16 points of similarity between the two prints. He stated that, in his opinion, the palm print lifted from the window sill was that of the defendant.

Alfred Luckas, a forensic chemist employed by the Du Page County crime lab, testified that he compared the hair recovered from the vagina of E.A. on July 20, 1988, with the standards taken from the defendant. He concluded defendant's hair standards were microscopically similar to the hair recovered from E.A. and that he believed that hair could have come from defendant. No hair standards were obtained from H.A. for comparison.

Christine Sahs, a forensic chemist for the Du Page County sheriff's office crime lab, testified that she conducted testing on the bed sheets recovered from complainants' home on July 3, 1988, and July 20, 1988. The sheets tested positive for semen. Ms. Sahs conducted tests on H.A. and concluded he was not the source of the semen. The vaginal and rectal smears obtained from E.A. tested positive for spermatazoa and red blood cells. Ms. Sahs sent samples of defendant's blood and E.A.'s blood along with samples of the semen stains obtained from the complainants' sheets after both incidents to Thomas Wahl.

A hearing was held outside the presence of the jury prior to the State's presentation of the testimony of Thomas Wahl, a forensic geneticist employed by Analytical Genetic Testing Center in Denver, Colorado, to determine whether the State could lay a sufficient foundation for Mr. Wahl's testimony regarding the results of his statistical analysis of the genetic marker testing conducted in connection with this case. Mr. Wahl testified that he has been employed as a forensic geneticist for approximately 10 years. He holds a bachelor's degree in medical technology with a minor in chemistry from the University of Wisconsin.

He described his job duties as receiving evidence of a biological nature, screening and analyzing evidence to determine if any biological fluids are present on the evidence, conducting biochemical testing to prove the identity of the biological fluids, performing genetic marker typing analysis on the biological evidence for the purpose of determining genetic markers in evidence, and issuing findings and conclusions in written reports. He has been qualified in the area of forensic genetics in courts in Wisconsin, Florida, Massachusetts, Cali-

fornia, Ohio, Colorado and Pennsylvania. He has rendered opinions in his work and in courts regarding population statistics and the probabilities of certain genetic markers occurring at random in approximately 300 to 400 cases, some of which included statistics generated by him.

On cross-examination, Mr. Wahl admitted that he did not have a degree in genetics or statistics, and in the early part of his professional experience he worked as a serologist. He has taken master's level courses in genetics and statistics. In addition, he has attended 10 to 12 workshops pertaining to forensic genetics. He also teaches workshops pertaining to forensic serology. He stated that the statistical principles or formulas that he applies are well recognized within the field of forensic genetics. His work is supervised by Dr. Moses Schanfield, the director of the lab, who has a Ph.D. in population genetics and anthropology. Dr. Schanfield reviews all of Mr. Wahl's statistics, including those he applied in this case. The trial court recognized Mr. Wahl as an expert in the field of forensic genetics and serology.

After conducting an electrophoresis test on standards taken from defendant, Mr. Wahl discovered defendant had a phosphoglucomutase or PGM phenotype with a rare variant. PGM is a genetic marker involving differences between individuals that exist at the DNA level. He detected the same rare variant when he tested the semen specimens taken from the sheets removed from E.A.'s home following both the July 3 and July 20, 1988, attacks. Wahl then used population statistics to determine the frequency with which that variant occurs in the male Mexican-American population, of which defendant is a part.

Wahl used a combination of population data bases as the basis for his statistics: one from a study conducted by Dale Dykes of the Minneapolis Blood Center published by the American Association of Blood Banks in 1981, and one conducted in Starr County, Texas, published in the American Journal of Human Genetics in 1986. He stated that both studies used a reliable method for accumulating a data base for generating statistical information regarding the probabilities or percentages of populations with a particular type of genetic marker. Wahl took the frequencies derived from these data bases and applied the "Hardy-Weinberg" equation to determine the phenotype frequencies of defendant's rare variant. He stated that the Hardy-Weinberg equation is universally accepted in population genetics.

After examination of Mr. Wahl, the court concluded that sufficient subject matter existed for which an expert could give an opinion and that a sufficient basis had been placed on the record for Mr. Wahl to

testify. Defendant then moved to exclude the testimony because its prejudicial effect outweighed its probative value. The court denied this motion, finding no evidence of a prejudicial effect. Wahl testified at trial. His testimony at trial was essentially the same as the testimony set forth above.

Lastly, Diane Contreras, defendant's former sister-in-law, testified that in July 1988 defendant resided with her and her family in their apartment at 1020 South Williams, Westmont, Illinois. She stated that the complainants' street bordered one side of her apartment complex. Late in July 1988, Ms. Contreras noticed a mark on defendant's hand. Defendant asked her to tell the police that he was with her on the night an older couple was robbed and raped if the police questioned him about the crime. She told him she could not do that. Defendant also asked her to obtain a copy of a flier with a sketch of a suspect in the crime.

The jury found defendant guilty on all seven counts. The trial court denied defendant's motion for a new trial and sentenced defendant to a total of 120 years. Defendant timely appeals.

### I. ADMISSIBILITY OF STATISTICAL PROBABILITY EVIDENCE

Defendant's first argument on appeal is that the trial court should not have permitted the State expert's statistical analysis of defendant's PGM phenotype variant probability in Mexican-American populations because, he argues, the population data base information upon which the expert based his opinion was unreliable. The State argues that Wahl was qualified as an expert and that any challenge to the basis of his opinion goes to the weight of his testimony, not its admissibility.

First, we note defendant does not contend the process of electrophoresis is unreliable. In fact, our supreme court has held that electrophoresis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood and is, therefore, admissible. (See *People v. Eyler* (1989), 133 Ill. 2d 173, 215, *cert. denied* (1990), 498 U.S. 881, 112 L. Ed. 2d 174, 111 S. Ct. 215; *People v. Thomas* (1990), 137 Ill. 2d 500, 517-18.) Defendant's challenge is limited to the reliability of the statistics generated by Wahl regarding the results of the electrophoresis process.

After the completion of the electrophoresis process on the samples, Wahl determined E.A.'s PGM phenotype was 1A/2A and defendant's PGM phenotype was 1B/W15. He described the W15 component as a rare genetic variant for all ethnic populations, occurring in less than 1% of the general population. Tests conducted on the semen

stains taken from the bed sheets from both the July 3 and July 20, 1988, attacks revealed the presence of the 1B/W15 PGM phenotype. Wahl testified that, using statistics derived from two different genetic studies involving Mexican-Americans and the "Hardy-Weinberg" equation, he derived a statistical probability for the frequency with which defendant's phenotype was likely to occur in Mexican-American males. He arrived at the conclusion that, due to the rarity of the 1B/W15 PGM phenotype, approximately only 1 in 4,500 Mexican-Americans could have been the source of the semen found on the sheets.

Defendant contends Wahl's statistics are flawed because they were derived from unreliable population data bases. Specifically, defendant contends that the Minneapolis study conducted in 1981 and used by Wahl to determine his statistic involved 404 subjects described as "Hispanics," not Mexican-Americans. On cross-examination, Wahl admitted the article used the term "Hispanics," and he admitted that term can be used to refer to a broad range of Spanish-speaking people, including South Americans, Puerto Ricans, Cubans, and Spaniards. However, Wahl contended the author of that study personally communicated to him that the study involved Mexican-Americans, not the broad range of Spanish-speaking people who could be categorized as "Hispanics." The author of the study was deceased at the time of trial. In addition, defendant contends that because all of Wahl's knowledge regarding the Starr County, Texas, study, which involved 733 Mexican-Americans in South Texas, was derived from the article published in the American Journal of Human Genetics in 1986, the figures derived from this population base are unreliable as well.

■ The admission of expert testimony is within the trial court's discretion and will not be reversed absent an abuse of discretion. (*People v. Eyler*, 133 Ill. 2d at 211; *People v. Miles* (1991), 217 Ill. App. 3d 393, 403.) To lay an adequate foundation for expert testimony, it must be shown that the facts or data relied upon by the expert are of a type reasonably relied upon by experts in that particular field in forming opinions or inferences. (See *Wilson v. Clark* (1981), 84 Ill. 2d 186.) In its discretion, it is for the trial court to determine whether the underlying facts or data upon which an expert bases an opinion are of a type reasonably relied upon by experts in the particular field, and, again, its determination will not be disturbed on review absent an abuse of discretion. *City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 186.

Defendant challenges the basis for Wahl's statistics, in part, because Wahl had no independent knowledge of the procedures used by

the authors of the studies upon which he relied. Defendant's argument that Wahl's reliance on the Minneapolis and Starr County, Texas, studies was not reasonable and, therefore, the statistics generated are unreliable is similar to the argument used by defendant in *People v. Lipscomb* (1991), 215 Ill. App. 3d 413.

In *Lipscomb*, defendant contended the State could not establish its DNA expert's reliance on a report generated by another was reasonable and that he had no opportunity to challenge the figures or effectively cross-examine the expert because the expert had no independent knowledge of the procedures used by the author of the report. (*Lipscomb*, 215 Ill. App. 3d at 433.) The court in that case rejected this argument, noting the expert testified that his final report, and the measurements in it, was the type reasonably relied upon by experts in the field. The court concluded it was then defendant's responsibility to challenge the sufficiency or reliability of the basis for the expert's opinion during cross-examination, and the determination of the weight to be given the expert's opinion is left to the finder of fact. *Lipscomb*, 215 Ill. App. 3d at 435.

● 2 Similarly, in this case, Wahl testified that the information from which he generated his statistics is the type reasonably relied upon by experts in the field of genetics and serology. The fact that Wahl's knowledge regarding the population data bases taken from the studies was limited to what he read in the publications does not invalidate his findings. It is permissible for experts to premise their testimony on information and opinions obtained from the reading of standard publications in their fields. (*People v. Lopez* (1992), 228 Ill. App. 3d 1061, 1074; *People v. Bradney* (1988), 170 Ill. App. 3d 839, 862.) The population data bases which formed the basis for the statistics generated by Wahl were published by the American Association of Blood Banks and the American Journal of Human Genetics, recognized publications in the field.

We find, as did the court in *Lipscomb*, that this testimony was properly admitted and that it was defendant's responsibility to challenge the reliability of the basis for Wahl's statistics on cross-examination, which defendant did competently. Statistics are admissible as relevant to identification, and any challenges to their reliability go only to the weight to be given the evidence. (*People v. Redmond* (1985), 135 Ill. App. 3d 534, 540; *People v. Lipscomb*, 215 Ill. App. 3d at 435; *People v. Miles*, 217 Ill. App. 3d at 405; *People v. Lopez*, 228 Ill. App. 3d at 1075. But *cf. People v. Harbold* (1984), 124 Ill. App. 3d 363.) The weight to be given to Wahl's opinion was properly left to the jury.

■ Defendant also challenges Wahl's opinion because he does not have a degree in statistics. Wahl testified that all of the information upon which he based his opinion is of the type relied upon by experts in the field of forensic genetics and serology. Wahl also testified that he studied statistics as a part of his training and much of his work involves the use of statistics. It is recognized that, no less than formal training, practical experience in a field may serve to qualify a witness as an expert on a particular subject. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 37.) Wahl testified that his supervisor, who holds a Ph.D. in genetics, reviewed all of his work, including his statistics. Thus, we conclude the trial court did not abuse its discretion in permitting Wahl's testimony regarding the statistics generated by him.

## II. ADMISSIBILITY OF EVIDENCE OF "OTHER CRIMES"

Defendant next asserts the trial court erred in admitting evidence of defendant's "other crimes" in the form of what he terms "the entirety" of the State's case regarding the July 20, 1988, incident because the incident did not prove his identity as the offender and caused substantial prejudice to his case. Defendant argues that the trial court acknowledged the prejudice such evidence would cause when it granted defendant's motion to sever the trial of the July 3, 1988, incident from the trial of the July 20, 1988, incident. We disagree.

■ It is well established that evidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish his propensity to commit a crime. (*People v. Thingvold* (1991), 145 Ill. 2d 441, 452; see also *People v. Lucas* (1989), 132 Ill. 2d 399; *People v. Richardson* (1988), 123 Ill. 2d 322; *People v. Bartall* (1983), 98 Ill. 2d 294; *People v. McKibbons* (1983), 96 Ill. 2d 176.) Evidence of the commission of other crimes is admissible, however, when such evidence is relevant to prove any purpose other than propensity to commit crime, such as *modus operandi*, intent, identity, motive, or absence of mistake. (*Thingvold*, 145 Ill. 2d at 452; *People v. Waldron* (1991), 219 Ill. App. 3d 1017, 1030.) It is within the sound discretion of the trial court to determine whether evidence of other crimes is relevant to a material issue and whether the probative value of such evidence outweighs its prejudicial impact. (*Waldron*, 219 Ill. App. 3d at 1030.) The court's ruling as to the admissibility of such evidence will not be reversed absent a clear showing of abuse. *Thingvold*, 145 Ill. 2d at 452.

After the State outlined the evidence it intended to present pertaining to the July 20, 1988, incident, the trial court found that it was

relevant to show identity and that its probative value outweighed any possible prejudice. The court admonished the jury a number of times during trial and gave a written instruction that the evidence pertaining to the July 20, 1988, incident was offered for the limited purpose of proving the identity of the offender.

Defendant's argument on appeal is essentially twofold. First, defendant argues the evidence pertaining to the July 20, 1988, incident was not relevant to prove identity, but, rather, it was only relevant to show the same person committed both offenses. Second, defendant argues that the evidence pertaining to the July 20, 1988, incident was presented in such detail that its probative value was outweighed by its prejudicial effect. Both of these arguments are unfounded.

■ First, the evidence pertaining to the July 20, 1988, offense was relevant to prove that not only did the same person commit both offenses, but that defendant was that person. Because the incident occurred in the darkness of early morning hours, neither E.A. nor H.A. got a good look at the offender's face. However, they did recognize the voice of the offender on July 20, 1988, as being the same voice they heard July 3, 1988. In addition, on July 20, 1988, the police recovered a hair and additional semen specimens which matched defendant's samples and the semen specimens recovered on July 3, 1988. Moreover, H.A. testified that on July 20, 1988, the offender stated something similar to, "You MF's didn't think I'd come back again." Lastly, defendant's former sister-in-law testified that defendant asked her to provide him with an alibi for July 20, 1988. This evidence, taken as a whole and combined with the evidence pertaining to the July 3, 1988, incident, provides evidence of defendant's identity as the perpetrator of the first offense.

■ Second, although it is true that evidence of other offenses admissible on the question of identity should be confined to such details as show the opportunity for identification and not the details of the crime (*Richardson*, 123 Ill. 2d at 341), no more details of the July 20, 1988, incident were presented at trial than necessary to show defendant's identity. *Modus operandi*, or "method of working," is nothing more than circumstantial evidence of identity, the rationale being that crimes committed in a similar manner suggest a common "author." (*People v. Watson* (1981), 98 Ill. App. 3d 296, 298.) In this case, there were no eyewitnesses to identify defendant's face. Rather, the evidence relating to identity involved the similarity between the two crimes, as well as defendant's statement on July 20, 1988, regarding his participation in the first crime and the statement of his former sis-

514

ter-in-law regarding his request for an alibi, in addition to the physical evidence linking defendant to both crimes. Thus, because the probative value of the evidence far outweighed its prejudicial effect, we conclude the trial court did not abuse its discretion in admitting the evidence for the purpose of showing identity. However, even if we were to conclude that some of the detail was not essential, the detailed evidence clearly did not constitute prejudicial and reversible error. See *Richardson*, 123 Ill. 2d at 341-42; *McKibbons*, 96 Ill. 2d at 186-87.

Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

GEIGER and DOYLE, JJ., concur.