THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL E. LIND, Defendant-Appellant.

Fourth District    No. 4—98—0612

Opinion filed September 24, 1999.

Daniel D. Yuhas, David M. Cialkowski, and Arden J. Lang, all of State Appellate Defender's Office, of Springfield, for appellant.

John P. Schmidt, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Thomas R. Dodegge, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In May 1998, a jury convicted defendant, Michael E. Lind, of aggravated battery of a child (720 ILCS 5/12—4.3(a) (West 1996)), and the trial court later sentenced him to 18 years in prison. Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt; and (2) the court made certain evidentiary errors. We affirm.

## I. BACKGROUND

In July 1996, the State charged defendant with four counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2), (a)(3) (West 1996)) and one count of aggravated battery of a child. The jury acquitted defendant of first degree murder and convicted him of aggravated battery of a child and involuntary manslaughter (720 ILCS 5/9—3 (West 1996)). The trial court subsequently set aside those convictions, and the case proceeded to a second trial on the charge of aggravated battery of a child, where the evidence presented showed the following.

Roy Mayfield, a paramedic, testified that around 12:30 p.m. on June 28, 1996, he responded to an emergency call at defendant's trailer. Once inside the trailer, Mayfield saw a woman, Jessie Hayes, performing cardiopulmonary resuscitation (CPR) on A.L., the four-

month-old daughter of defendant and defendant's then-wife, Erin Lind. While Jessie continued performing CPR, Mayfield spoke with defendant to obtain medical information about A.L. Defendant told Mayfield that he was feeding A.L. when she suddenly went limp and stopped breathing. Defendant did not tell Mayfield that A.L. had fallen nor did he mention "any type of shaking." Mayfield described defendant's demeanor as "very calm, cool[,] and collected." After gathering A.L.'s medical information, Mayfield performed CPR on A.L. until the ambulance arrived. Once A.L. was placed inside the ambulance, paramedics continued resuscitation efforts.

Jessie, who was defendant's neighbor, testified that on the day of the incident, she saw defendant walk across the street to her trailer and knock on the door. Jessie yelled to defendant to tell him that she and her husband, Brian Hayes, were not inside. Defendant then walked back to the edge of the driveway and told Jessie that A.L. was not breathing and needed help. Jessie went inside defendant's trailer while Brian called an ambulance. A.L. was lying on a stack of blankets fully dressed, including socks on both feet, and she appeared "grayish-blue." Jessie, a certified nursing assistant, "kind of shook" A.L. to get her attention. She then undressed A.L. and began performing CPR. She continued performing CPR until a paramedic arrived and took over. While the paramedic performed CPR, Jessie held A.L.'s head because it was "bobbing back and forth."

Jessie was aware that A.L. suffered from central apnea, a condition in which an individual temporarily stops breathing. She had once heard a nurse explain to defendant and Erin that when A.L. experienced apnea, they should call A.L. by name and "kind of shake her a little bit so you could get her attention."

Paul Haley, A.L.'s maternal grandfather, testified that around 10:05 a.m. on June 28, 1996, he went to defendant's trailer and knocked several times during a 30-minute period. No one responded. Later that day, Haley asked defendant why he had not answered the door earlier that morning, and defendant told Haley that he had been doing laundry at his mother's house. (Defendant's mother testified that defendant could not have been at her home on that morning because he did not have a key to her house.) Haley then asked defendant what had happened to A.L., and defendant initially responded that he had been feeding her when she went limp. Haley then told defendant he "better be straight if something happened" to A.L., and defendant told Haley that he "gave [A.L.] a bath and put lotion on her getting ready to put her socks on her and dropped her and picked her up and dropped her again." Defendant never told Haley that he had shaken A.L.

Lana Schmidt, an emergency room physician, testified that she examined A.L. after the paramedics brought her to the hospital. A.L. was not breathing, and she showed signs of serious brain damage. Schmidt observed "a lot of bleeding" in A.L.'s eyes; such retinal hemorrhage is a sign of "shaken baby syndrome," a term used to describe infants who have experienced a vigorous and violent movement of their heads in a backward and forward motion. Emergency room physicians stabilized A.L., and she was placed in the pediatric intensive care unit, where she later died.

Defendant told Schmidt that he had taken A.L. off the apnea monitor prior to feeding her. After he fed A.L., he noticed that she had "some milk spewing from her mouth and her nose," and defendant picked her up and took her to a neighbor's house to get help. Defendant did not tell Schmidt that A.L. had fallen or that he had shaken A.L., and he specifically denied that A.L. had suffered any impact to her head.

Marilyn Kincaid, an ocular pathologist, testified that shaken baby syndrome results in retinal hemorrhage. Kincaid stated that some physicians and researchers believe that shaking an infant, by itself, will result in retinal hemorrhage, while others believe that an impact injury is also necessary to produce such bleeding. Kincaid examined tissue samples taken from A.L.'s eyes and detected hemorrhage throughout several layers of the retinas, extending to the ora serrata (the anterior edge of the sensory portion of the retina). Kincaid opined that, "in this case[,] I felt that the degree of hemorrhage and its extent was absolutely classic for the so-called shaken baby syndrome." She also opined that only a "[v]ery substantial force" could have caused the extent of retinal hemorrhage detected in A.L.'s eyes. Kincaid further stated that the extent of hemorrhage she detected in A.L.'s eyes could occur only in cases of shaken baby syndrome, in older persons suffering from vein occlusion, or in persons involved in very severe motor vehicle accidents. In addition, she opined that an impact injury resulting from a five-foot fall would not cause such retinal hemorrhage.

On cross-examination, Kincaid testified that improperly performed CPR can cause retinal hemorrhaging. She acknowledged that head trauma, followed by vigorous shaking, and then a lengthy period of CPR could combine to create a relatively severe amount of retinal hemorrhaging.

On redirect examination, Kincaid opined that shaking and failed attempts at resuscitation could not have caused the extensive injuries A.L. suffered.

Travis Hindman, a forensic pathologist, testified that on June 30,

1996, he performed an autopsy on A.L. and found that she had suffered a fracture of the occipital bone, which is located on the back of the skull. He stated that it is unusual to find a skull fracture in a four-month-old child because an infant's skull bones are flexible. Hindman opined that the skull fracture, along with the redness he saw on A.L.'s scalp, was caused by "broad surface blunt impact to the skull and the head," which meant that the back of A.L.'s head came into contact with a flat surface. He also noticed that the sutures (the line of union between the skull bones), which usually touch each other, were widely separated. Hindman stated that the "reason for this wide separation of the sutures was an increase in the pressure within the cranial cavity[,] which was expanding [the sutures]." He also found that the sutures were "bulging and blue in color, [which was] indicative of blood beneath them."

Hindman also found a subdural hematoma, "a collection of blood which is found between two membranous layers covering the brain" and a hemorrhage in several areas of the subarachnoid space, which is between the outer layer of the brain and the brain surface. He also detected severe brain swelling.

Following the autopsy, Hindman prepared a report for the coroner, which indicated that A.L.'s cause of death was "brain injury with associated subdural hematoma and subarachnoid hemorrhage due to blunt force trauma to the head." "[P]rimarily to refresh [his] memory about the nature of such injuries and what kinds of forces are incurred," Hindman then reviewed 40 to 50 articles on the subject of falls and the resulting injuries in children. He stated that he commonly reads literature in professional journals prior to authorizing his final autopsy report. Based upon his professional experience, his consultation with another expert regarding A.L.'s injuries, and his reading of the journal articles, Hindman opined that A.L.'s injuries were inconsistent with a fall from five feet onto a carpeted floor.

Hindman issued his autopsy report prior to Kincaid's having completed her report. He had anticipated that his diagnosis might differ from Kincaid's because his autopsy had not included an examination of the interior of A.L.'s eyes. Hindman opined that his findings were consistent with "[s]haken [b]aby [i]mpact [s]yndrome," in which the violent shaking of the infant's head is accompanied by the head's impacting on some surface. When Hindman read Kincaid's report, it did not alter his opinion.

On cross-examination, defense counsel challenged one of the bases of Hindman's opinion that A.L.'s injuries were inconsistent with a five-foot fall onto a carpeted floor. In particular, defense counsel cross-examined Hindman using two articles, which discussed separate stud-

ies regarding falls and the resulting injuries in infants and children. In the first study, the author had dropped 15 infant cadavers from a height of three feet onto different surfaces, finding that all 15 cadavers suffered skull fractures. In the other study, the author studied 18 children, with a mean age of 2.4 years, who had fallen from a height of less than three feet and concluded that such falls can be lethal, especially in toddlers. Hindman stated that the two articles did not alter his opinions in this case.

On redirect examination, Hindman testified that a fall from five feet onto a carpeted floor would not explain A.L.'s injuries

"[b]ecause of the eye findings to a large extent[;] the presence of retinal hemorrhage is not typical of a fall alone.

[Retinal hemorrhage is] more typical of the rotational acceleration, deceleration injuries as one would encounter in [s]haken [b]aby [syndrome]."

Erin testified that she and defendant had decided to have a child because they thought it might improve their marriage. Erin stated that having A.L. did make their marriage better "[t]o a certain point," because defendant had not hit her following A.L.'s birth. Erin also stated that defendant was jealous of A.L. and he became upset because Erin spent too much time with her and spent money on her.

Shortly after her birth, A.L. was diagnosed with central apnea, and Erin and defendant received training in using the apnea monitor and performing infant CPR. Erin stated that they were taught to tickle A.L.'s feet or wave her arms lightly to arouse her. However, the instructors told them to "never shake a baby."

At around 9:30 a.m. on June 28, 1996, Erin placed A.L. on a blanket on the floor near defendant's feet and left the trailer. When she returned around 12:30 p.m., defendant came outside and told her A.L. was not breathing. Erin described defendant's demeanor as follows: "[A]t first it sounded like it was no big deal, you know, maybe the dog had an accident on the floor until I heard [A.L.] wasn't breathing." Erin denied that she previously had told a police officer that defendant had run out of the trailer screaming that A.L. was not breathing. Defendant twice told Erin that he had been feeding A.L. when she went limp.

Illinois State Police investigator Richard Weaver testified that on June 28, 1996, he and Cynthia Robbins, a Department of Children and Family Services caseworker, interviewed defendant at the hospital and asked him to explain what had happened to A.L. Defendant told Weaver that he had fed A.L. and placed her on a blanket when "Boom, just like that, she went limp on me and was just staring." Weaver then told defendant that A.L. could not have been injured under those cir-

cumstances. Defendant then stated that he did not want to say what really happened because he was afraid that people would think he was a bad father. Weaver again asked defendant what happened to A.L., and defendant responded, "It happened like I told you but I dropped her." Defendant explained that he had dropped A.L. while sitting in a chair attempting to put her socks on her feet. Weaver then told defendant that A.L.'s injuries were too severe to have resulted from such a fall, and defendant stated that he had been standing when A.L. slipped from his hands, fell about five feet, and landed on her head.

Defendant subsequently made a written statement, which was read to the jury. In that statement, defendant stated that he accidentally dropped A.L. from a height of five feet, shook her slightly to get her to breathe, and then shook her harder while she was in a sitting position. A.L. then began to breathe again and defendant held her for 15 or 20 minutes, after which time she "was giggling and playing." About 12:15 p.m., defendant prepared another bottle for A.L., and she drank about 1½ ounces. Defendant then placed her in a car seat on the floor and walked out of the room to get a diaper. When he returned, he noticed that A.L. was limp and not breathing. He then ran across the street to get help from a neighbor.

Police officer Craig Bangert testified on defendant's behalf that when he interviewed Jessie on June 28, 1996, she stated that on the day of the incident, defendant had run to her trailer and banged on the door.

Robbins testified that when she interviewed Erin on June 28, 1996, Erin stated that on the day of the incident, defendant had run out of their trailer and told her A.L. was not breathing.

On this evidence, the jury found defendant guilty. The court then sentenced defendant as stated, and this appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant first argues that the State failed to prove him guilty of aggravated battery of a child beyond a reasonable doubt because the State did not prove that he acted with the mental state required for a conviction of aggravated battery of a child. In support of this argument, defendant cites the following: (1) Kincaid did not know all of the facts, including that A.L.'s head bobbed back and forth during CPR attempts, when she formed her opinion that A.L.'s retinal hemorrhaging could have resulted only from "very vigorous" shaking; (2) Kincaid previously had observed only 10 cases of severe retinal hemorrhage; (3) evidence showed that "the retinal hemorrhaging could have resulted from accidental means or means incident to innocent efforts

to resuscitate" A.L.; (4) Hindman's opinion that A.L.'s injuries could not have resulted from a five-foot fall was "ultimately groundless" because he based his opinion on articles not reasonably relied upon by experts in his field; (5) Kincaid and Hindman did not agree as to the cause of A.L.'s injuries; (6) defendant changed his story regarding what happened to A.L. only because he was embarrassed about being a negligent father; and (7) no evidence showed that defendant had abused A.L. in the past.

In response, the State contends that the evidence was sufficient to support the guilty verdict in this case. The State points out that the jury, as the trier of fact, had the responsibility to determine "the credibility of witnesses and the weight to be given their testimony," and the jury was "not required to accept any possible explanation compatible with defendant's innocence and elevate it to the status of reasonable doubt." The State also urges this court not to substitute its own judgment for that of the trier of fact. In support of its argument, the State cites the following: (1) the medical evidence presented showed that A.L.'s injuries resulted from shaken baby syndrome and shaken baby impact syndrome; (2) defendant gave conflicting accounts regarding what happened to A.L.; (3) Erin testified that defendant was jealous of A.L.; and (4) all of defendant's accounts were inconsistent with the medical testimony. We agree with the State.

■ Section 12—4.3(a) of the Criminal Code of 1961 (Code) defines aggravated battery of a child as follows:

"Any person of the age 18 years and upwards who intentionally or knowingly, and without legal justification and by any means, causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years *** commits the offense of aggravated battery of a child." 720 ILCS 5/12—4.3(a) (West 1996).

Because of its nature, knowledge is ordinarily established by circumstantial evidence, rather than by direct proof. In addition, a "defendant is presumed to intend the probable consequences of his acts, and great disparity in size and strength between the defendant and the victim, as well as the nature of the injuries, may be considered in this context." *People v. Rader*, 272 Ill. App. 3d 796, 803, 651 N.E.2d 258, 263 (1995). Thus, a defendant need not admit knowledge for the trier of fact to find that the defendant acted knowingly. *People v. Ripley*, 291 Ill. App. 3d 565, 568, 685 N.E.2d 362, 365 (1997).

■ In *People v. Oaks*, 169 Ill. 2d 409, 457-58, 662 N.E.2d 1328, 1349-50 (1996), the supreme court addressed a defendant's argument that the State's evidence was not sufficient to sustain his conviction and wrote the following:

"[I]t is not the function of the reviewing court to retry a defendant

when considering a challenge to the sufficiency of the evidence of his guilt. [Citations.] Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. [Citations.] In considering a defendant's challenge to the sufficiency of the evidence, the relevant question is whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

In addition, in *People v. Beverly*, 278 Ill. App. 3d 794, 798, 663 N.E.2d 1061, 1064 (1996), this court wrote that it will not set aside a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt [as to] the defendant's guilt." Moreover, a conflict between experts does not necessitate a finding that the evidence was insufficient to support a conviction; the trier of fact may either accept or reject an expert's conclusion. *People v. Patton*, 249 Ill. App. 3d 844, 849, 619 N.E.2d 1377, 1381 (1993); see also *People v. Sandy*, 188 Ill. App. 3d 833, 841, 544 N.E.2d 1248, 1253 (1989) ("The inability of the State's experts to totally rule out shaking or a combination of a blow and shaking as the cause of the brain injury does not create a reasonable doubt. *** The jury could have determined that both occurred and that, under the circumstances of the case, such conduct indicated a knowing mental state on defendant's part").

■ In the present case, evidence showed that (1) A.L. sustained fatal injuries when she was alone with defendant; (2) her injuries were consistent with shaken baby syndrome and shaken baby impact syndrome; (3) A.L.'s injuries were inconsistent with a fall from five feet onto a carpeted floor; and (4) shaking and failed CPR attempts could not have caused the extensive retinal hemorrhaging Kincaid detected in A.L.'s eye tissue. In addition, the medical experts concluded that A.L.'s injuries were inconsistent with defendant's conflicting versions of what happened. Moreover, at the time of the incident, defendant was an adult, whereas A.L. was a four-month-old baby. Reviewing the evidence presented under the appropriate standard of review, we conclude that a rational trier of fact reasonably could have found that defendant acted intentionally and knowingly in causing great bodily harm to A.L.

### B. The Basis of Hindman's Opinion Testimony Regarding A.L.'s Injuries

Defendant next argues that the trial court erred by failing to strike Hindman's opinion testimony that A.L.'s injuries could not have been caused by a fall from five feet onto a carpeted floor. Specifically, he

contends that Hindman's opinion was based upon journal articles not reasonably relied upon by experts in the field. We disagree.

■ To lay an adequate foundation for expert testimony, it must be shown that the facts, data, or opinions relied upon by the expert are of a type reasonably relied upon by experts in that particular field in forming opinions or inferences. *People v. Contreras*, 246 Ill. App. 3d 502, 510, 615 N.E.2d 1261, 1267 (1993). The trial court has the discretion to determine whether the underlying facts, data, or opinions upon which an expert bases an opinion are of a type reasonably relied upon by experts in the particular field, and a reviewing court will not disturb its determination absent an abuse of that discretion. *People v. Houser*, 305 Ill. App. 3d 384, 394, 712 N.E.2d 355, 362 (1999).

Experts may base their opinions upon information and opinions obtained from reading standard publications in their particular field. *People v. Bradney*, 170 Ill. App. 3d 839, 862, 525 N.E.2d 112, 126 (1988). In *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 556-57, 356 N.E.2d 779, 786-87 (1976), the supreme court addressed the plaintiff's contention that during direct examination, the defendant's expert medical witness had improperly referred to published clinical studies upon which he had based his opinion. During direct examination, the witness had opined that no relationship existed between the plaintiff's condition and the use of a certain oral contraceptive drug. He then testified, in pertinent part, as follows:

> " 'I base my opinion on my experience and making such evaluations, a detailed study of all the clinical studies that have been published in the literature relative to the incidence of thromboembolic disease in patients receiving oral contraceptives and in patients not receiving oral contraceptives.' " *Lawson*, 64 Ill. 2d at 557, 356 N.E.2d at 786.

In rejecting the plaintiff's argument that the witness had improperly referred to the clinical studies, the supreme court wrote as follows:

> "[The expert witness] referred to these studies and reports as 'published clinical studies.' These studies represent a great mass of factual information much broader in scope than any one doctor or research team could hope to assemble. These studies are clearly a part of the scientific or professional literature which the witness could properly consider in forming his opinion. In 3 Wigmore, Evidence, sec. 687 (Chadbourn rev. ed. 1970), at page 3, it is stated:
>
> > 'Medical science is a mass of transmitted and collated data from numerous quarters; the generalizations which are the result of one man's personal observation exclusively are the least acceptable of all. The law must recognize the methods of medical science. It cannot stultify itself by establishing, for judicial inquiries, a rule never considered necessary by the

medical profession itself. It is enough for a physician, testifying to a medical fact, that he is by training and occupation a physician; whether his source of information for that particular fact is in part or entirety the hearsay of his fellow-practitioners and investigators is immaterial ***.' " *Lawson*, 64 Ill. 2d at 557, 356 N.E.2d at 786-87.

█ In this case, Hindman testified that, following A.L.'s autopsy, he could not rule out the possibility that her injuries resulted from a five-foot fall onto a carpeted floor. He thus conducted an extensive review of the literature regarding falls and resulting injuries in children to refresh his "memory about the nature of such injuries and what kinds of forces are incurred." Hindman also testified that, after completing autopsies, he frequently reviewed professional literature to refresh his memory regarding the nature of certain injuries prior to formulating an opinion regarding the cause of death. He based his opinion that A.L.'s injuries were inconsistent with a fall from five feet onto a carpeted floor upon (1) his literature review, (2) his professional experience as a forensic pathologist, and (3) his consultation with another expert in his field.

The prosecutor in this case could have been more explicit in eliciting from Hindman that physicians reasonably rely upon such professional publications in forming their opinions. See *Houser*, 305 Ill. App. 3d at 395, 712 N.E.2d at 362 ("The first question is not whether [the witness] relied on [the document], but whether it is the type of document reasonably relied upon *by experts* in his field" (emphasis in original)). However, Hindman's testimony as a whole suggested that pathologists routinely review such literature in the course of performing their duties. Moreover, it can hardly be doubted that physicians routinely and reasonably rely on professional literature, including clinical studies published in professional journals, in making diagnoses and formulating opinions.

Nonetheless, defendant contends that the journal articles upon which Hindman based his opinion are not reasonably relied upon by "experts in the particular field of fractures and falls" because the articles "were not the product of controlled studies." We disagree.

Hindman testified as to the nature of studies regarding children's falls as follows:

"I've made an extensive review of the literature as people at various libraries could help me with, and, in doing so, I find that there is a fair amount of confusing and perhaps conflicting information that has been published on the subject. The reason for that conflict is that there is no such thing as a controlled study in an issue of this type.

A controlled study, using the scientific process, *** permits us to say that all other things being the same, then here's what one, by virtue of repeated observations, can expect and as you can readily understand, a controlled breaking of a child's skull does not fit into what would be considered to be good, moral, ethical practices; therefore, the conclusions that are really reached in the articles, in the many articles that have been published on this, are for the most part anecdotal."

Hindman's testimony indicates that the lack of controlled studies is inherent in the area of children's falls. To a large extent, as Hindman pointed out, researchers *must* rely upon anecdotal evidence—that is, reports from parents, caretakers, police, or other sources to determine the nature and cause of a child's fall. Furthermore, the ultimate issue is whether the foundation sufficiently guarantees trustworthiness to justify introduction of the testimony. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 703.1, at 647 (7th ed. 1999) (hereinafter Handbook) (an expert's "reliance is reasonable only if the facts, data, or opinions possess trustworthiness in excess of that possessed by the ordinary hearsay statement"). Reviewing the record before us in light of the supreme court's discussion in *Lawson*, we conclude that the professional journal articles upon which Hindman partially based his opinion are sufficiently trustworthy. Accordingly, we hold that the trial court did not abuse its discretion by allowing Hindman to render an opinion based, in part, upon those articles.

In so concluding, we reject defendant's contention that Hindman's own concerns with the "confusing and perhaps conflicting information" found in the professional literature at issue here somehow destroyed its trustworthiness. Any weakness in the basis of an expert's opinion goes to the weight of the testimony; it should not affect its admissibility if the facts, data, or opinions are reasonably relied upon by experts in the relevant field. See *People v. Eiskant*, 253 Ill. App. 3d 773, 776, 625 N.E.2d 1018, 1021 (1993). The opposing party has the responsibility to challenge on cross-examination the sufficiency or reliability of the expert's opinion. See *People v. Lipscomb*, 215 Ill. App. 3d 413, 435, 574 N.E.2d 1345, 1359 (1991); see also Handbook § 705.2, at 696 ("[o]n cross-examination, counsel may probe the witness's qualifications, experience and sincerity, weaknesses in his basis, the sufficiency of his assumptions, and the soundness of his opinion"). Defendant here had ample opportunity to cross-examine Hindman, and he availed himself of that opportunity. It was for the jury to consider the significance of Hindman's opinions and the validity of his conclusions, which it did.

### C. The Chain of Custody for the Eye Tissue Slides

Defendant next argues that the trial court erred by admitting Kin-

caid's testimony that eye tissue mounted on microscopic slides showed retinal hemorrhage because the State failed to establish a sufficient chain of custody for the slides. Specifically, he contends that the State failed to prove a complete and continuous chain of possession of A.L.'s eye tissue from the time of her autopsy until the time of trial because (1) no State witness explained what happened to the eye tissue after Kincaid first examined the eyes at Springfield Memorial Hospital (Memorial); and (2) once delivered to Memorial, "the tissue samples were susceptible to handling by any technician or pathologist who had access to the laboratory." We disagree.

■ A trial court has broad discretion in determining the admissibility of evidence, and we will not disturb its ruling on appeal absent an abuse of discretion and a showing of prejudice to the defendant. *People v. Lach*, 302 Ill. App. 3d 587, 593, 707 N.E.2d 144, 149 (1998). To establish a sufficient chain of custody, the State need not disprove every possibility that the evidence was tampered with. Rather, the State need only show that it was reasonably probable that the evidence remained unchanged in any important respect or was not substituted. *People v. Buckley*, 282 Ill. App. 3d 81, 91, 668 N.E.2d 1082, 1089 (1996). "Unless [the] defendant provides actual evidence of tampering or substitution, the State need only establish the stated probability, and any deficiencies go to the weight and not the admissibility of the evidence." *Lach*, 302 Ill. App. 3d at 594, 707 N.E.2d at 149.

■ In this case, Hindman testified that during the June 1996 autopsy of A.L., he removed A.L.'s eyes, placed them in a container, labeled them with an autopsy number (CC—127—96), and personally delivered them to the histology department at Memorial. In July 1996, Kincaid retrieved a container with two eyes, labeled with A.L.'s name and the autopsy number "CC—127—96," from Memorial. She then verified that the container and the laboratory request form had the same name and number on them. She cut each eye into three parts and placed the central part of each eye into a plastic box (a "cassette"), which was labeled with the number "96CC127." (Kincaid testified that those eyes were the only child's eyes she examined during July and August 1996.) The cassette was then processed through a number of steps (in which certain solutions are introduced into the cassette over several hours to create a paraffin block) in an automatic system. Hospital technicians then mounted the eye tissue on microscopic slides. Kincaid subsequently received four slides labeled with A.L.'s case number (CC—127—96), which she examined.

In addition, John Dietrich, chairman of Memorial's pathology center, testified that Memorial's histology department is a restricted

area that is locked when none of its employees are there. Dietrich also testified concerning Memorial's standard procedure for handling autopsy tissue samples. All autopsy tissue samples go through an automatic dehydrating process before a laboratory technician mounts the tissue on microscopic slides. Dietrich stated that nothing was unusual about the handling of A.L.'s case. See *People v. Edmundson*, 247 Ill. App. 3d 738, 744, 617 N.E.2d 446, 452 (1993) (evidence of a routine practice of an organization is admissible to prove an action was taken on a given occasion if it is corroborated).

Defendant failed to introduce any actual evidence that A.L.'s eyes had been tampered with or substituted at Memorial. Defendant's reliance on the absence of testimony from the hospital technician who sliced and mounted A.L.'s eye tissue on the slides amounts to nothing more than mere speculation of substitution or tampering. Such speculation does not undermine the foundation laid by the State in this case. See *People v. Rhoades*, 74 Ill. App. 3d 247, 253, 392 N.E.2d 923, 927 (1979) (the defendant's reliance on the absence of proof of exclusive control at all points in the chain of custody amounted to mere speculation, which was insufficient to undermine the foundation laid for the admission of the evidence at issue). Reviewing the record before us, we conclude that the trial court did not err by finding that the State had established a sufficient chain of custody for A.L.'s eye tissue and admitting Kincaid's testimony that the eye tissue mounted on microscopic slides showed retinal hemorrhage.

In so concluding, we note that the cases defendant relies upon do not require a different result. In *People v. Terry*, 211 Ill. App. 3d 968, 970-71, 570 N.E.2d 786, 787 (1991), the arresting officer seized a clear plastic bag and 32 smaller "knotted white packets" that had been shaken from the bag into a toilet and onto the wet floor. The officer placed the evidence, which he estimated to weigh about eight grams, in a sealed envelope and put the envelope inside a police station safe. A police chemist later examined the evidence and found that the larger plastic bag contained 42 smaller packets, which were wet with a yellow, uremic substance and which weighed about 12 grams. *Terry*, 211 Ill. App. 3d at 971, 570 N.E.2d at 787. In holding that the State had failed to establish a sufficient chain of custody, the appellate court noted that the discrepancies in number and weight cast "more than a reasonable doubt that the evidence recovered [by the arresting officer] was not the same evidence analyzed" by the police chemist. *Terry*, 211 Ill. App. 3d at 973, 570 N.E.2d at 788.

*People v. Gibson*, 287 Ill. App. 3d 878, 679 N.E.2d 419 (1997), involved a nearly five-fold increase in the amount of drugs from the time of seizure until the time of the defendant's trial. In concluding

that the State had failed to establish a sufficient chain of custody, the appellate court stated, in relevant part, as follows:

"[T]he State's attempt at establishing a chain of custody was even more deficient than that found in *Terry*. [Citation.] Not only was there no evidence regarding the handling and safekeeping of the evidence between the custody of [the arresting officer] and [the police chemist], there was also no evidence specifically detailing what procedures [the arresting officer] himself employed with regard to the safekeeping of that evidence. \*\*\*

Accordingly, the foregoing break in the chain of custody, coupled with the substantial discrepancies as to the weight of the evidence, lead us to find that the State failed to demonstrate a reasonable probability that the drug evidence used to convict defendant had not been altered or substituted." *Gibson*, 287 Ill. App. 3d at 882, 679 N.E.2d at 422.

Unlike in *Terry* and *Gibson*, where the defendants presented substantial evidence of tampering or substitution, defendant here failed to introduce any evidence that A.L.'s eyes had been tampered with or substituted at Memorial. Moreover, while drugs are fungible, a baby's eyes are not. We surmise that there are far fewer baby's eyes stored in Memorial's pathology center than there are drug samples stored in police lockup. Indeed, Kincaid testified that the eyes labeled as A.L.'s were the only child's eyes she examined during July and August 1996.

Nor is the present case like *People v. Winters*, 97 Ill. App. 3d 288, 296, 422 N.E.2d 972, 978 (1981), in which the court held that a blood sample was not admissible because the State had failed to present testimony that the vial had been sealed after the blood sample was placed in it. Here, both Kincaid and Dietrich testified that the eye tissue slides were processed in accordance with standard hospital procedures.

### D. Evidence Regarding Defendant's Prior Bad Acts

The material in this section is not to be published pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, P.J., and McCULLOUGH, J., concur.