2015 IL App (3d) 130052

Order filed June 19, 2015
Motion to Publish granted September 28, 2015
Modified Opinion upon denial of rehearing September 28, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD JUDICIAL DISTRICT

A.D., 2015

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-13-0052 Circuit No. 08-CF-568 |
| | ) | |
| KELLY KLEIN, | ) ) | Honorable Daniel J. Rozak and Honorable Richard Schoenstedt, |
| Defendant-Appellant. | ) | Judges Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Justices Carter and Lytton concurred in the judgment and opinion.

_____

**OPINION**

¶ 1    On August 29, 2008, during his first week at defendant's in-home daycare, seven month old O.D. suffered a brain injury while defendant was providing day care for the infant. O.D.'s injury required him to be airlifted to the Peoria Children's Hospital in Peoria, Illinois where he remained hospitalized for several days. Medical experts at the Peoria Children's Hospital of Illinois at St. Francis Medical Center in Peoria (Peoria Children's Hospital) concluded that O.D.'s injuries were non-accidental and resulted from a significant amount of force. Defendant,

the only adult providing for O.D.'s care after his mother left him at daycare, claimed O.D. caused his own injuries on August 29, 2008. The State's treating medical experts all testified defendant's explanation was not consistent with O.D. injuries.

¶ 2    After the trial judge found defendant guilty of aggravated battery of a child, defendant filed two separate motions for substitution of judge for cause which were assigned to another judge for consideration. The new judge dismissed both motions for substitution due to the insufficiency of the allegations claiming the trial judge was prejudiced against defendant. The matter was then returned to the trial judge for purposes of posttrial motions and sentencing.

¶ 3    The trial judge denied defendant's posttrial motion for new trial and sentenced defendant to serve six years' incarceration. Defendant filed a timely notice of appeal challenging various evidentiary rulings by the trial judge and contesting the sufficiency of the evidence resulting in the finding of guilty. In addition, on appeal, defendant challenges the ruling dismissing defendant's motions for substitution of the trial judge for cause. We affirm.

¶ 4                                    BACKGROUND

¶ 5    On May 8, 2008, the State charged defendant with aggravated battery of a child, a Class X felony. The indictment alleged on or about August 29, 2007, "defendant, a person over the age of 18 years, knowingly and without legal justification caused great bodily harm to O.D., a minor, a child under the age of 13 years, in that she caused injury to the brain of O.D., by the use of force." On July 19, 2010, defendant waived her right to a jury trial and the case proceeded to a bench trial.[1]

---

[1]The bench trial was held on seven different days between July 19, 2010, and June 10, 2011, when the trial court found defendant guilty. Both parties requested continuances throughout the trial. Many doctors testified in this case and scheduling their testimony caused some of the delays.

2

¶ 6                    I. The Bench Trial Evidence

¶ 7        The State presented several of O.D.'s family members as witnesses during the bench trial including: Kim Basham, O.D.'s mother; David D., O.D.'s father; Gary and Lisa Basham, O.D.'s maternal grandparents; and Christina and Jerome Sukley, O.D.'s maternal aunt and uncle. These witnesses testified to the following facts. O.D. was born January 23, 2007, without any health problems. Kim and David lived together for the first six months after O.D.'s birth. Dr. Daniel Jurak, O.D.'s doctor, saw O.D. regularly for wellness checkups.

¶ 8        On August 13, 2007, O.D. was seven months old and learning how to sit up while propped up with pillows, but was not ambulatory and could not crawl, walk, or stand up without assistance. On that date, Kim began new employment and O.D. began attending daycare with defendant, a daycare provider licensed by the Department of Children and Family Services (DCFS).

¶ 9        The evening of the first day of daycare, Kim noticed a bump and bruise on the back of O.D.'s head. The next day, defendant told Kim this bump resulted when O.D. fell backwards on the tile floor while seated on the floor.

¶ 10       On Monday, August 27, 2007, David had overnight visitation with O.D and took O.D. to daycare the next morning. Kim picked O.D. up from daycare on August 28, 2007, and noticed a scratch near O.D.'s diaper that evening.

¶ 11       On August 29, 2007, Kim took O.D. to daycare in the morning. At that time, defendant's daycare clients included: 7-month-old O.D., a second infant named Natalie, defendant's two-year-old son, and another two-year-old named Connor. Later in the day, defendant telephoned Kim at work around 2:00 p.m. and told Kim that O.D. "scooted" himself from the carpeted family room to the kitchen and bumped his head on the tile floor. Kim telephoned defendant a

3

second time 45 minutes later and defendant told her O.D. had a "pretty decent goose egg on his head." During the second call, defendant told Kim that O.D. "was crying so hard he couldn't breathe when it happened." Defendant also asked Kim if it was normal for O.D. to "be sitting up sleeping in his high chair for about three hours?"

¶ 12　　Due to these telephone calls from defendant, Kim left work early to pick O.D. up from daycare. When she arrived at defendant's home, Kim immediately observed a "really big bump on his head" near the right forehead area, along with a mark that looked like "road rash" or a rug burn near his nose, mouth and chin area. Kim said O.D. appeared to be very tired and was unable to keep his eyes open.

¶ 13　　Shortly after picking O.D. up from day care on August 29, 2007, Kim and her mother, Lisa, took O.D. to the emergency room (ER) at the Morris Hospital. Dr. Benjamin Johnston attended to O.D. at the ER. Dr. Johnston informed the family that O.D. had a brain injury and needed to be airlifted to Peoria Children's Hospital. O.D. remained at Peoria Children's Hospital for a total of seven days.

¶ 14　　Gary, O.D.'s grandfather, testified that defendant called the Basham's house after Kim and Lisa left for the hospital on August 29, 2007. When Gary reported to defendant that Kim took O.D. to the emergency room, defendant responded by stating "she was sorry about what happened to [O.D.]." Defendant called Gary a second time that evening requesting information regarding the "times and whereabouts for Kimberly" because defendant wanted to "keep a record for herself as to what had happened."

¶ 15　　The family members testified they observed that O.D. appeared pale and limp when Kim arrived home from daycare on August 29, 2007. During their testimony, the family members reviewed photographs of the injuries found on O.D.'s body by hospital employees on August 29,

4

2007, which depicted: a "goose egg" bump on O.D.'s right forehead, a separate injury near O.D.'s hairline, red dots near a scratch above O.D.'s right eye, rug burn marks on O.D.'s mouth and lip area, bite or scratch marks on O.D.'s stomach near his naval, and bruises on O.D.'s leg. The witnesses testified they did not observe any of those injuries on O.D.'s body prior to him attending daycare on the morning of August 29, 2007.

¶ 16        Officer Todd Lyons of the Wilmington Police Department investigated the case involving the injuries to O.D. and questioned defendant on September 5, 2007. Defendant did not make any statements to Officer Lyons, but gave him a copy of a three-page, written "Accident Report Statement" defendant said she prepared for DCFS on August 30, 2007. In this written accident report, defendant stated, at 2:45 p.m. on August 29, 2007, O.D. was "@ the edge of the carpet trying to get a toy from what I gather, and reached forward and clunked his head on the tile part of our flooring." Defendant's written accident report provided that defendant "rushed to get [O.D.] and get a cold compress on his head," O.D. stopped crying around 3:15 p.m., and defendant then called Kim. Defendant said O.D. seemed fine to her.

¶ 17        Eileen Strejc testified she went to defendant's house to pick up her granddaughter, Natalie, from daycare on August 29, 2007, around 3:45 p.m. Defendant's husband arrived home from work at the same time and they entered the house together. Strejc observed O.D. at that time and O.D. looked like he had been crying. She also observed O.D. had a visible bump on his forehead. Defendant told Strejc that O.D. was on "all fours" and bouncing back and forth and then fell forward and hit his head on the tile floor.

¶ 18        Dr. Terry Voirin, an expert ophthalmologist, testified he examined O.D. at the Peoria Children's Hospital on September 2, 2007. Dr. Voirin observed several abnormal circular retinal hemorrhages in the back of O.D.'s left eye and one abnormal hemorrhage just below the optic

5

nerve in the back of the right eye. Dr. Voirin explained retinal hemorrhages can be caused from pressure building inside of the skull on the brain. Dr. Voirin diagnosed the cause of O.D.'s retinal hemorrhages as "non-accidental trauma." Dr. Voirin opined, based on a reasonable degree of medical certainty, O.D.'s injuries did not "come from him hitting his head reaching for a toy."

¶ 19    Dr. Benjamin Johnston worked in the ER at Morris Hospital on August 29, 2007, and examined O.D. that evening. Dr. Johnston observed a contusion on O.D.'s right forehead, a few other abrasions and contusions, and that O.D. was pale and not "moving particularly well." Dr. Johnston ordered a CT scan of O.D.'s head, chest and abdomen and determined the scan of O.D.'s head showed an "acute subdural hematoma" caused by bleeding of the veins between the dura and the skull. Dr. Johnston stated it is more difficult for a young child to get a subdural hematoma than it is for an adult because a child's brain is "right up against the skull." According to the doctor, a subdural hematoma usually occurs when a young child is "dropped, thrown, ejected from a car, restrained in a high speed motor vehicle accident, [or] some sort of rapid acceleration-deceleration blunt traumatic injury."

¶ 20    Dr. Johnston opined that O.D. could not have inflicted the subdural hematoma on himself and concluded the babysitter's explanation of O.D. falling forward while reaching for a toy was not consistent with the child's injuries. Dr. Johnston ordered O.D. to be airlifted to a neurosurgeon at Peoria Children's Hospital and O.D.'s case was reported to DCFS for further investigation.

¶ 21    Dr. Kay Saving testified she was board-certified in pediatric hematology, pediatric oncology, and was one of approximately 200 physicians certified in child abuse pediatrics in the United States. Dr. Saving was also the medical director of the Pediatric Resource Center, a

6

program where "we see children for evaluation of possible abuse and neglect, so that would be physical abuse, sexual abuse, and other kinds of abuse." Peoria Children's Hospital asked Dr. Saving to do a consultation for the possibility of abuse to O.D.

¶ 22    Dr. Saving examined O.D. on August 30, 2007, and he appeared to be a well-nourished child, but showed signs of neurological problems. Dr. Saving's external exam of O.D. showed several indications of trauma occurring on different planes of O.D.'s body including: a petechial bruise on his right forehead, a bruise and abrasion on his upper lip, a bruise and linear scratch on the right side of his head by the hairline, a semicircular scratch over his right eye, a small abraded bruise on his stomach to the left of his belly button, a couple of linear bruises under his belly button, a bruise on his upper inner left thigh, and a bruise on his left knee. Dr. Saving said O.D.'s CT scan and MRI revealed a large subdural hematoma in the left side of the child's brain opposite the bruise that was previously described as a goose egg on his right forehead. According to Dr. Saving, if there was a significant enough force at the point of O.D.'s "goose egg," the brain could bounce against the other side of the skull resulting in O.D.'s subdural hematoma. Dr. Saving explained, when a child suffers a significant blunt-force impact to the head involving an acceleration/deceleration movement, this impact can result in retinal hemorrhaging consistent with the ophthalmologist's findings. Dr. Saving testified multiple bruises on multiple planes of the body on an infant who was non-ambulatory was "very, very unusual," and O.D. could not have inflicted these injuries on himself. Dr. Saving concluded this "constellation of findings together is compatible with abusive head trauma or intentional traumatic brain injury." When a significant impact occurs, swelling usually occurs underneath that location within minutes to hours of the injury. Dr. Saving opined, based on a reasonable

7

degree of medical certainty, O.D.'s injuries were caused after he was dropped off at daycare but before O.D.'s mother picked the infant up from daycare on August 29, 2007.

¶ 23 Dr. Daniel Jurak testified he was a solo family practitioner who had been O.D.'s doctor since his birth. Dr. Jurak said he had seen O.D. six times between his birth and August 29, 2007, and O.D. was healthy and developing well. On August 22, 2007, Dr. Jurak saw O.D. as a patient for a sore throat, and O.D. appeared to be a normal, healthy, growing infant who was developing normally with no neurologic or developmental delay concerns. The State then rested its case.

¶ 24 After denying the defense's motion for directed verdict, the defense began its case-in-chief. The defense called Dr. John Plunkett, a certified medical pathologist, as an expert witness. Dr. Plunkett stated he previously testified in court over 200 times for both the prosecution and defense, however, since 2004 Dr. Plunkett testified exclusively for the defense. In the case at bar, Dr. Plunkett said he relied solely on O.D.'s written medical records and notes to form his opinion and did not consult with any treating doctors, family members, or examine O.D. himself. Dr. Plunkett determined O.D. had a small, subdural hematoma on the left front part of the brain that was caused by an impact injury, and he accepted and relied on defendant's explanation as to how O.D.'s injury occurred on August 29, 2007. Dr. Plunkett testified that he reviewed O.D.'s medical records and MRI results from Peoria Children's Hospital and determined O.D. had extra-axial fluid on his brain at the time the MRI was performed. In Dr. Plunkett's opinion, O.D. had a pre-existing medical condition that involved an increased amount of extra-axial fluid in his brain, which can cause a significant risk of subdural bleeding even with minor trauma to the head. According to Dr. Plunkett, defendant's account of O.D.'s bump on his head could have resulted in O.D.'s subdural hematoma with this pre-existing extra-axial fluid in the brain condition.

8

¶ 25    Dr. Plunkett agreed the photograph of O.D.'s hairline injury and the injuries on other planes of O.D.'s body would not have resulted from the single impact described by defendant. Dr. Plunkett also agreed that it would be unusual for an infant who is immobile to have these bruises, although Dr. Plunkett thought O.D. was able to crawl when this injury occurred.

¶ 26    Joseph Klein, defendant's husband testified he arrived home from on August 29, 2007, and at the same time Eileen Strejc arrived at the house around 3:30 p.m. that day. Joseph did not notice anything unusual about O.D.

¶ 27    Defendant testified she did not notice anything unusual about O.D. the morning of August 29, 2007. After all four children ate lunch, defendant said she took all four children outside. The two infants placed outside in "pack and plays." Around 2:30 p.m., defendant put the two older boys in cribs upstairs to take naps and placed O.D. on his stomach on the floor while she fed Natalie. At that time, defendant observed O.D. lift himself up on his arms and reach for a toy, and then "all of a sudden his arms gave out and he just hit his head on my floor." Defendant said O.D. cried hard for 5 to 10 minutes and defendant put ice on O.D.'s head. Defendant telephoned Kim to tell her what happened after attending to O.D.'s injury.

¶ 28    Defendant denied telling Kim that O.D. was crying so hard he had trouble breathing or that O.D. was sleeping in his high chair. After 3:45 p.m., defendant said she did not notice anything unusual about O.D.'s behavior. Around 4:45 p.m., Kim picked O.D. up early and defendant showed Kim where O.D. bumped his head.

¶ 29    Defendant said she called Kim's house that evening and Kim's father said Kim took O.D. to the hospital. Defendant said she was surprised because she thought O.D. was fine when he left her residence that day. Defendant also called David, O.D.'s father, that evening and David told her O.D. was fine.

9

¶ 30    Defendant testified she did not strike, beat, or hit O.D. with anything to cause his injury on August 29, 2007. Defendant also testified she did not "grab [O.D.] by the leg and throw him around" and did not "bash his head into anything." Defendant said O.D.'s other injuries, shown in the photographic exhibits, were not present when O.D. was in her care on August 29, 2007. The defense then rested its case.

¶ 31    Dr. Saving testified as a rebuttal witness stating she had reviewed the transcripts of Dr. Plunkett's testimony and opinion at the State's request. To prepare for rebuttal testimony, Dr. Saving again looked at O.D.'s MRI and CT scans from August 2007, and reviewed those scans with Dr. Bugaieski, a neuroradiologist, to determine whether O.D. had the pre-existing condition known as "benign extra-axial fluid of infancy." Dr. Saving said Dr. Bugaieski told her it was his opinion that O.D. did not have that pre-existing condition. The defense objected on hearsay grounds, and the court overruled the objection.

¶ 32    Dr. Saving testified that it was common in her field to consult with other medical personnel when attempting to diagnose how a child incurred certain injuries and she relies on other physician's reports and conclusions to reach her ultimate opinion. In any case involving head injuries to a child, it is standard procedure at the Peoria Children's Hospital to have a neuroradiologist discuss his "formal interpretation" of the films with her in conjunction with her own review of their written reports. Dr. Saving said she also looked again at O.D.'s films independently, to prepare for rebuttal, and it was Dr. Saving's medical opinion that O.D. did not have "benign extra-axial fluid of infancy" in August 2007. Dr. Saving said she originally spoke with Dr. Fraser, a neuroradiologist, in August 2007 regarding O.D.'s scans, but spoke with Dr. Bugaieski to prepare for rebuttal because Dr. Fraser was not available. Dr. Saving testified that

10

extra-axial fluid can develop in the brain after a child receives a traumatic brain injury causing swelling in the brain.

¶ 33    The defense orally moved for a mistrial because the State did not tender Dr. Bugaieski as a potential expert witness in discovery.  Alternatively, the defense moved to strike Dr. Saving's rebuttal testimony in its entirety based on this nondisclosure.  The State argued, although Dr. Saving consulted with Dr. Bugaieski, a neuroradiologist, Dr. Saving formed her own independent expert opinion that O.D. did not have "extra-axial fluid of infancy."  The State also contended Dr. Saving was presented as a rebuttal witness, offered in response to the defense's expert, and therefore this was not a discovery violation.  The court denied defendant's motion for mistrial and the motion to strike Dr. Saving's rebuttal testimony.

¶ 34                              II. The Court's Ruling

¶ 35    On June 10, 2011, the trial court found O.D. was in good health prior to attending daycare, which was substantiated by Dr. Jurak's testimony.  The court found the evidence indicated the child's injuries occurred while at daycare on August 29, 2007.  The court noted defendant's account that O.D. accidentally injured himself while crawling on the tile floor was supported by her expert witness, Dr. Plunkett.

¶ 36    However, the court found O.D.'s treating physicians provided overwhelming evidence that O.D.'s injuries did not result from accidental trauma occasioned by the child's own actions. Specifically, the court noted Dr. Saving testified that the various injuries on different planes of the child's body were very unusual for a child who is not yet mobile, and the compilation of these injuries was indicative of physical abuse because the child could not have inflicted these injuries on himself.  The court further found these injuries were caused by some amount of force and contradicted defendant's explanation.  The court found defendant guilty of the charged

11

offense of aggravated battery of a child. The court ordered a presentence investigation report and set the matter for a sentencing hearing.

¶ 37 The defense filed "Defendant's Motion to Reconsider Finding of Guilt, or as a Less Favored Alternative, Motion for a New Trial." This motion, in pertinent parts, requested a judgment of acquittal or for a new trial due to alleged discovery violations regarding Dr. Saving's reference to hearsay statements made by undisclosed radiologists. The trial court found Dr. Saving's testimony was offered for the purpose of rebutting the defense expert's testimony regarding extra-axial fluid and found there was no discovery violation for non-disclosure of the radiologist, Dr. Bugaieski. Further, the court noted that an expert can rely on information provided from other experts and the testifying expert "does not necessarily have to give a basis for their opinion."

¶ 38 III. Motions for Substitution of Judge for Cause After Guilty Finding

¶ 39 On September 22, 2011, defendant retained new counsel who filed a "Motion for Substitution of Judge for Cause" (first motion for substitution) on October 18, 2011, after the finding of guilty. This first motion alleged the trial judge shared a close personal friendship with Gary Basham. In addition, the motion alleged the trial judge's adult children were listed as "friends" on "Facebook" or associates on "Linked In" with adult members of the Basham family, some of whom testified at the trial. The defense asserted these relationships created an appearance of impropriety in violation of the Code of Judicial Conduct (Ill. S. Ct. R. 63(C)(1)(a) (eff. Apr. 16, 2007)) and, thus, established "cause" to substitute the trial judge.

¶ 40 Defendant's attached affidavit indicated defendant "believed the judge was a close, personal friend of Gary Basham." Further, defendant's affidavit asserted the trial judge's children had "personal relationships" with some of the Basham's family members. Defendant

attached copies of website pages from the internet, such as "friends" listings on "Facebook" and connections through "Linked In" to document the connection between the trial judge's adult children and the Basham family.

¶ 41 In a "Response to Defendant's Motion for Substitution of Judge for Cause," the State asserted defendant's first motion for substitution was legally insufficient because the motion alleged merely the appearance of impropriety by the trial judge and did not assert the judge was less than fair and impartial. The State also objected to the motion on the ground that the motion was untimely, since the judge had found defendant guilty at the conclusion of the trial. The State argued information concerning the appearance of impropriety could have been easily discovered and raised by the defense before the trial judge entered a guilty finding. The State asked the court to deny the first motion for substitution for cause based on these legal grounds. The first motion for substitution was assigned to Judge Richard Schoenstedt for consideration.

¶ 42 A. Proceedings on Defendant's Motions for Substitution for Cause

¶ 43 During a status hearing before Judge Schoenstedt, on November 7, 2011, the court received an affidavit from the original trial judge. In his affidavit, the trial judge averred that Gary Basham was not a close personal friend and the trial judge had never met or talked to Gary. Further, the affiant trial judge stated he did not personally know any of the Basham family who testified and did not know that any of the Basham family members were friends or acquaintances with the judge's adult children who no longer resided with him. The trial judge's affidavit said he did not participate on his children's Facebook or other social network sites and had no knowledge of any information exchanged between his adult children and others on these social networks.

13

¶ 44     At the status hearing on November 7, 2011, on the record, Judge Schoenstedt observed that the State's responsive pleading was in the nature of a motion to dismiss, which argued the timeliness and legal insufficiency of defendant's motion as a matter of law. Judge Schoenstedt advised both parties that he would be treating the State's motion as a motion to dismiss at the hearing scheduled for December 14, 2011. Defense counsel did not object, but requested that if Judge Schoenstedt denied the motion to dismiss, defense counsel would like to go forward with evidentiary hearing on the same date. Judge Schoenstedt said he would conduct the evidentiary hearing immediately after the arguments if he ruled in defendant's favor.

¶ 45     On December 14, 2011, Judge Schoenstedt denied the State's motion to dismiss on the grounds that the motion for substitution was untimely. Judge Schoenstedt then turned to the issue of the alleged appearance of impropriety. Defense counsel argued he was "not questioning whether the trial judge was fair and impartial," but that the trial judge should have recused himself based on the appearance of impropriety. Defense counsel further stated:

> "And if he didn't know [about the connections between various family members and the Basham's], that is one of the pitfalls of being a judge. You have to be ethical. You have to know who your family's friends are, and you can't hear witnesses who are close friends with your children and then say the defendant got a fair trial in the view of the public; it's simply not acceptable."

¶ 46     In making his ruling on the appearance of impropriety, Judge Schoenstedt stated he accepted each averment in the trial judge's affidavit as true. The court found that "the Illinois Supreme Court does not require judges to investigate their adult children's relationships prior to bench trials." Further, based on the trial judge's affidavit, the court found, at the time of trial, the trial judge had no personal knowledge of anything that would give rise to actual prejudice or the

14

appearance of impropriety. Judge Schoenstedt found that, even if the trial judge's relatives and the Basham's relatives attended the same school years ago, worked at the same place of employment, or shared loosely defined Facebook "friend" relationships, the allegations in the first motion to substitute was insufficient on its face. Judge Schoenstedt found there were no allegations in defendant's first motion for substitution questioning the trial judge's impartiality or fairness or and did not claim the trial judge had a reason to know there could be any possibility of an appearance of impropriety. Ultimately, Judge Schoenstedt determined an evidentiary hearing was not required because defendant's motion was legally insufficient on its face.

¶ 47    Judge Schoenstedt also denied the defense's motion to reconsider his ruling on the first motion for substitution. Judge Schoenstedt reiterated defendant's first motion to substitute was insufficient because the motion did not allege actual prejudice.

¶ 48                         B. Amended Motion for Substitution of Judge for Cause

¶ 49    Thereafter, defendant filed an amended motion for substitution of judge for cause (second motion for substitution) "under seal," on June 22, 2012, alleging similar facts to those outlined in the first motion for substitution, but contending these similar facts showed actual prejudice. The second motion for substitution also accused the trial judge of making "false averments in his affidavit," which demonstrated actual prejudice due to the trial judge's "deliberate act of concealment to obfuscate his favorable predisposition toward the Bashams on account of their close ties with his family." Defendant contended the trial judge's "unqualified denials" had to be false because they "defy human experience under the circumstances."

¶ 50    Defendant's affidavit expounded on the methods she used to discover information about the judge's family from various internet social networking websites she accessed after the trial

15

court found her guilty. Defendant's second motion for substitution alleged these new false averments in the trial judge's affidavit demonstrated actual prejudice.

¶ 51 Judge Schoenstedt heard arguments on July 9, 2012, regarding the State's motion to dismiss the second motion for substitution. The State's written motion sought dismissal based on *res judicata* because the second motion to substitute did not include new facts or additional facts that were not available on the internet or discoverable before the bench trial. Further, even if *res judicata* did not apply, the State argued that defendant conceded she could not show actual prejudice based on similar facts and arguments presented during hearing on the first motion for substitution. The State also contended the second motion included insufficient factual allegations to establish actual prejudice on the part of the trial judge, even if the factual allegations were presumed to be true. The defense argued the second motion for substitution included "documentary evidence putting into question * * * the veracity of [the trial judge's] averments [in his affidavit]."

¶ 52 On August 20, 2012, in open court, the court granted dismissal of the second motion to substitute finding, even if he took all of defendant's allegations as true, "there is no connection to [the trial judge] that would remotely show or establish personal bias and therefore actual prejudice." Judge Schoenstedt found this second motion for substitution was insufficient on its face to show actual prejudice, and dismissed and denied defendant's second motion for substitution without conducting an evidentiary hearing. The case was placed back on the trial judge's call for sentencing.

¶ 53 IV. Motion for New Trial, *Krankel* Hearing, and Sentencing

¶ 54 The defense filed a successive motion for a new trial on November 13, 2012, and a motion for a *Krankel* hearing, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), alleging

various claims of ineffective assistance of trial counsel. The defense called defendant's trial counsel to testify regarding his representation of defendant during the trial.

¶ 55        Defendant's trial counsel could not independently recall whether he was aware of documents, allegedly in his trial file, regarding incidents where O.D. fell and hit his head on four occasions during the first year following the incident on August 29, 2007. Trial counsel recalled knowledge of one incident occurring at the Godley Park District Childcare Center where O.D. fell and bloodied his lip, but he did not recall seeing documents of this incident. Trial counsel denied conducting any research about traumatic brain injuries and shaken baby syndrome. Instead, trial counsel stated he relied on his expert, Dr. Plunkett, to address those medical issues. Trial counsel admitted he did not file a pretrial motion to conduct a *Frye* hearing (*Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923)) regarding Dr. Saving's expertise. Trial counsel acknowledged he did not independently interview or subpoena Dr. Spomar, named as one of O.D.'s treating physicians at Peoria Children's Hospital. He also agreed he did not present any character witnesses during the trial on behalf of defendant.

¶ 56        Defendant testified she had requested her trial counsel to contact Dr. Spomar as a potential defense witness to explain his notation in the medical records that O.D. had extra axial fluid on his brain when O.D. came to Peoria Children's Hospital. Defendant also wanted trial counsel to present character witnesses, including defendant's niece, who would testify defendant was a good aunt, and defendant's brother-in-law, who would testify that defendant was easy-going, never cross or agitated, and was trustworthy with his own children.

¶ 57        Regarding the *Krankel* hearing, the court found defendant's trial counsel was not ineffective for failing to introduce evidence concerning falls by O.D., which post-dated the date

17

of this offense. Specifically, the court found it was significant that O.D. was not crawling or walking on the date of the offense, but was independently mobile when the later falls occurred.

¶ 58    Regarding whether trial counsel researched articles about "shaken baby syndrome," the court found it was not applicable because this case involved blunt force trauma rather than shaken baby syndrome. Finally, the trial court determined that trial counsel was not ineffective when he failed to call defendant's proposed character witnesses to testify. Therefore, the court denied the defendant's motion for a new trial based on ineffective assistance of counsel during the bench trial.

¶ 59    The trial judge held a sentencing hearing on January 15, 2013, and sentenced defendant to six years' imprisonment. Defendant filed a timely notice of appeal.

¶ 60                                        ANALYSIS

¶ 61    Defendant raises five issues on appeal. Defendant contends the trial court erred by allowing the State's medical expert, Dr. Saving, to refer to hearsay statements by two radiologists who interpreted O.D.'s CT and MRI scans, which she relied on in forming her own expert opinion. Next, defendant submits that she was denied effective assistance of trial counsel when her attorney failed to introduce certain evidence at trial. Additionally, defendant contends her posttrial motions to substitute the trial judge for cause should not have been denied without an evidentiary hearing. Further, in the alternative, defendant argues her motions to substitute judge for cause based on an appearance of impropriety should have been allowed on the merits. Finally, defendant argues the evidence was insufficient to prove defendant was guilty of aggravated battery of a child beyond a reasonable doubt. The State submits the trial court properly ruled on all of these issues.

18

¶ 62                          I.  Dr. Saving's Reference to Hearsay Statements

¶ 63          First, we address defendant's argument that the trial court erred by allowing Dr. Saving to refer to inadmissible hearsay statements by two radiologists who interpreted O.D.'s CT and/or MRI scans.  The State submits the radiologists' reports and personal statements to Dr. Saving were only referenced by Dr. Saving as part of the information she considered when formulating her own expert opinion.

¶ 64          Initially, the parties dispute whether this issue was properly preserved by defendant for appeal.  The State argues that, after the court overruled the defense's hearsay objection, the defendant "apparently accepted" the court's hearsay ruling and adopted another approach to prohibit the introduction of this information.  The defense argued the State violated discovery by failing to disclose the names of the radiologists to the defense.

¶ 65          It is well established, to preserve an issue for appeal, a defendant must object at trial and raise the issue in a posttrial motion.  *People v. Herron,* 215 Ill. 2d 167, 175 (2005).  Here, the defense initially voiced a hearsay objection to Dr. Saving's testimony regarding her discussions with two radiologists.  Specifically, defense counsel objected to Dr. Saving's statement that when speaking to Dr. Bugaieski, Dr. Bugaieski shared his view that O.D. did not have the pre-existing medical condition of "benign extra-axial fluid of infancy."  The defense again raised this issue in its motion for new trial.  Therefore, we conclude the hearsay issue was preserved for purposes of appeal.

¶ 66          Next, we examine whether the trial court erred by overruling defendant's hearsay objection.  The admissibility of evidence by the trial court is reviewed for an abuse of discretion.  *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).  In *Wilson v. Clark*, 84 Ill. 2d 186 (1981), Illinois

19

adopted an earlier version of Rule 703 of the Federal Rules of Evidence (Fed. R. Evid. 703) regarding expert testimony.

¶ 67 Under this version of Rule 703, medical records and other experts' opinions are admissible as the foundation for forming the testifying expert's opinion when they consist of facts and data reasonably relied upon by experts in the medical field to reach their own conclusions. *People v. Williams*, 238 Ill. 2d 125, 136-37 (2010). The facts or data upon which a medical expert bases an opinion, if it is of a type reasonably relied upon by experts in the particular field, need not be admissible in evidence in order for the opinion or inference to be admitted. *Id*. at 137.

¶ 68 Here, Dr. Saving testified it was common in her field to consult with treating physicians and radiologists when dealing with children's brain injuries before she solidified her own opinion regarding the causation of a particular child's brain injury. When preparing for her rebuttal testimony, Dr. Saving testified that she merely consulted with Dr. Bugaieski, the neuroradiologist, about whether O.D. had a pre-existing condition of benign extra-axial fluid of infancy but formed her own independent opinion that O.D. did not have this pre-existing condition after independently reviewing O.D.'s CT and MRI scans herself. Further, the statements of the neuroradiologists were not offered for the truth of the matter asserted, therefore, they were not hearsay statements. *Id.* at 135. We conclude the trial court did not abuse its discretion by allowing the admission of Dr. Saving's testimony regarding her discussions with the radiologists as part of the information she considered before formulating her own independent opinion.

¶ 69                    II.  Ineffective Assistance of Defense Counsel

¶ 70        Defendant submits that she received ineffective assistance of trial counsel when her attorney failed to investigate and introduce evidence that might benefit and/or exonerate defendant during the bench trial.  In reviewing an ineffective assistance of counsel claim, this court defers to the trial court's findings of fact unless they are against the manifest weight of the evidence, but we review *de novo* whether counsel's omissions support an ineffective assistance claim.  *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006).

¶ 71        First, defendant contends that her trial counsel failed to investigate and present available medical testimony by Dr. Spomar for her bench trial reinforcing Dr. Spomar's notations in the medical records that the CT scan performed after O.D.'s injury revealed the presence of extra-axial fluid in his brain.  Defendant contends Dr. Spomar's testimony would have supported her contention that the child suffered from a pre-existing condition, which would exaggerate the consequences of a slight bump to the head.

¶ 72        An attorney's decision regarding whether to present a particular witness is generally a strategic choice that does not support a claim of ineffective assistance of counsel.  *People v. Richardson*, 189 Ill. 2d 401, 414 (2000).  Additionally, counsel cannot be deemed ineffective for failing to present cumulative evidence.  *People v. Hayes*, 2011 IL App (1st) 100127, ¶ 42.  We conclude defendant's trial counsel was not ineffective for failing to present Dr. Spomar as a witness.

¶ 73        Defendant's expert, Dr. Plunkett, relied on Dr. Spomar's report, along with O.D.'s other medical records, when formulating his own expert opinion concerning the extra-axial fluid.  Dr. Plunkett testified O.D.'s medical records from the Peoria's Children Hospital showed O.D. had extra-axial fluid appearing in his MRI scan.  Hence, defense counsel elected to present this

21

information regarding a potential pre-existing condition to the trial court as part of Dr. Plunkett's testimony.

¶ 74    Next, defendant asks this court to determine whether defendant's trial counsel was ineffective for failing to investigate and tender evidence of defendant's character as a good aunt, as a good and kind person, and as very trustworthy when in the company of her brother-in-law's children. It is well established in Illinois that a defendant in a criminal action is allowed to present evidence of his previous good character when it is inconsistent with the crime charged. *People v. Lewis*, 25 Ill. 2d 442, 445 (1962). Nonetheless, evidence revealing that a defendant charged with aggravated battery to a child was loving and caring toward other children may not be particularly probative of whether that defendant abused the child at issue. See *People v. Wright*, 234 Ill. App. 3d 880, 895-96 (1992).

¶ 75    The State's case was based on evidence that the child's life-threatening head injury resulted from blunt force trauma or a fall that required more strength or mobility than this child possessed at the time of the injury. The State's theory was premised on the fact that this child could not have injured himself.

¶ 76    Defendant did not dispute she was the sole adult present with the child at the time these serious injuries occurred. In addition, she agreed the other children in her house were napping when this child sustained these serious injuries. Based on these uncontested facts, we conclude defense counsel's failure to offer the testimony of character witnesses, who would testify that defendant did not harm their children and was a good and kind person, would not have affected the outcome of the bench trial.

22

¶ 77                    III.  Motions for Substitution of Trial Judge for Cause

¶ 78            Before addressing the merits of this issue, it may be beneficial to review the procedural

context of the first and second motions for substitution because the timing of the motions and the

nature of the relief requested are both atypical.  Defendant did not question the court's

impartiality during the bench trial on the merits until the after the trial judge found defendant

guilty of aggravated battery of a child.  In fact, during defense counsel's argument regarding the

first motion for substitution, defense counsel argued he was not questioning whether the trial

judge was actually fair and impartial during the trial, only that an appearance of impropriety

existed.

¶ 79            In addition, we point out section 114-5(d) of the Code of Criminal Procedure of 1963

(725 ILCS 5/114-5(d) (West 2010)) provides, if the motion for substitution is granted, the relief

available to the movant is the appointment of another judge to conduct future proceedings.

However, it is important to note that the statute does not contain a provision requiring the newly-

appointed judge to set aside all rulings of the previous judge as defendant in this case has

requested of the trial court and now on review.  In fact, it is long established where a petition for

substitution of judge is improperly denied, all the actions of the court *subsequent thereto* are

void.  *People v. Ethridge*, 78 Ill. App. 2d 299, 304 (1966).

¶ 80            As an added procedural twist in this case, it does not appear defendant preserved the issue

related to Judge Schoenstedt's decision to deny the requests for substitution of the trial judge for

cause.  Our careful review of the record reveals this issue was not included in defendant's

successive motion for new trial filed on November 13, 2012, after Judge Schoenstedt's decisions.

However, the State has not claimed forfeiture and the defense has not raised plain error with

respect to Judge Schoenstedt's dismissals of the motions for substitution of the trial judge without conducting an evidentiary hearing.

¶ 81                                A. Appearance of Impropriety vs. Prejudice

¶ 82        Defendant relies on Rule 63(C)(1)(a) of the Code of Judicial Conduct, which requires a judge to recuse himself from a proceeding where the judge's impartiality might reasonably be questioned, in support of her position that she had the right to have the trial judge substituted from her case for cause. Ill. S. Ct. R. 63(C)(1)(a) (eff. Apr. 16, 2007). Based on this provision, defendant claims Judge Schoenstedt should have allowed her to plead facts in a motion for substitution for cause establishing that the trial judge had a duty to recuse himself to avoid even the appearance of impropriety. She contends the appearance of impropriety is a proper basis for defendant to request the trial judge's substitution for cause, even after a finding of guilty.

¶ 83        Both parties suggest that the standard of review regarding this issue is whether Judge Schoenstedt's decision was contrary to the manifest weight of the evidence, citing to *People v. Jones*, 219 Ill. 2d 1, 18 (2006). However, whether an alleged appearance of impropriety can be the sole basis to support a motion for substitution for cause, after the trial judge has made a substantive ruling in a case, involves a question of law. We review claims regarding issues of law *de novo*. *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 10; *People v. Stevens,* 338 Ill. App. 3d 806, 810 (2003).

¶ 84        Our supreme court has provided helpful guidance with respect to the law pertaining to the differences between requests for a court to recuse itself under the Code of Judicial Conduct versus a motion compelling the substitution of judge for cause under either the civil or criminal statutes. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 45. Whether a judge should recuse himself is a decision that rests *exclusively within the determination of the individual judge*,

24

whereas petitions for substitution for cause under the statute can be brought by a party and are decided by another judge. *Id*. ¶¶ 45-46.[2] The *O'Brien* court held, "[I]n construing the term 'cause' for purposes of a substitution once a substantial ruling has been made in a case, Illinois courts have consistently required actual prejudice to be established, not just under the current statute, but under every former version of the statute." *Id*. ¶ 30. Our supreme court, in *O'Brien*, expressly rejected the proposition of allowing a party "to replace the actual prejudice standard with the appearance of impropriety standard." *Id.* ¶ 43. "To so hold would mean that the mere *appearance* of impropriety would be enough to force a judge's removal from a case." (Emphasis in original.) *Id*. Based on this well-established case law, we conclude Judge Schoenstedt properly decided the motion for substitution for cause, following substantive rulings and a finding of guilt by the trial judge, by ruling that defendant must allege sufficient facts establishing actual prejudice of the trial judge against defendant and not merely the appearance of impropriety. Thus, we next consider the sufficiency of defendant's pleadings alleged in her motions for substitution for cause.

¶ 85         The case law requires the party requesting substitution for cause to first meet initial threshold requirements by alleging sufficient grounds, if taken as true, that would justify granting a substitution for cause. *In re Estate of Wilson,* 238 Ill. 2d 519, 554 (2010). "Empowering litigants to unilaterally halt pending trial proceedings without first meeting any threshold timing, *pleading*, or procedural requirements would be unprecedented in our system of justice."

---

[2] We recognize the *O'Brien* case applied the civil statute for substitution for cause (735 ILCS 5/2-1001(a)(3) (West 2010)) and the case at bar deals with the criminal statute for substitution for cause (725 ILCS 5/114-5(d) (West 2010)). However, the *O'Brien* court discussed the similarity between the language of the civil and criminal statutes for substitution of judge for cause and applied both criminal and civil cases to reach that decision.

(Emphasis added.) *Id.* at 561.[3] A defendant who seeks a substitution of judge for cause bears the burden of establishing actual prejudice. 725 ILCS 5/114-5(d) (West 2010); *People v. Patterson,* 192 Ill. 2d 93, 131 (2000). Prejudice is defined as " 'animosity, hostility, ill will, or distrust towards this defendant.' " *Id.* (quoting *People v. Vance,* 76 Ill. 2d 171, 181 (1979)).

¶ 86                      B. Dismissal of First Motion to Substitute

¶ 87        Since our review is *de novo*, we begin by examining the allegations set out in the first motion for substitution. This motion alleged, at best, the trial judge knew Gary Basham and/or the trial judge's adult children knew other Basham family members who were listed as "friends" or "connections" in social networking websites. The first motion for substitution alleged the trial judge engaged in conduct, namely presiding over defendant's bench trial, which created an appearance of impropriety and retroactively invalidated the trial court's finding of guilt and warranted a new trial.

¶ 88        We emphasize that defense counsel admitted he was "not questioning whether the trial judge was fair and impartial," during the arguments defense counsel presented to Judge Schoenstedt during the hearing on the State's request to dismiss the defense's first motion for substitution. The defense merely argued that the trial judge should have recused himself based on the appearance of impropriety.

¶ 89        The case law discussed above establishes that a potential appearance of impropriety is not equivalent to actual prejudice. Therefore, we conclude the first motion for substitution was insufficient on its face to state a claim for substitution of the trial judge for cause based on a purported appearance of impropriety. Accordingly, a full evidentiary hearing was not necessary prior to Judge Schoenstedt denial of defendant's first motion for substitution on those grounds.

---

[3]The statutory language and requirements for substituting a judge for cause in a civil case have been held to be analogous to those in a criminal case. *Wilson*, 238 Ill. 2d at 553-54.

¶ 90                    C. Dismissal of Second Motion for Substitution

¶ 91          Next, we consider the sufficiency of defendant's second motion for substitution. Based on our review, we recognize the second motion to substitute incorporated similar, but more detailed, facts in comparison to those set out in the first defense motion. This second motion was filed under court seal presumably because newly-hired defense counsel made some very serious allegations against the trial judge. In part, newly-retained defense counsel asserted the trial judge's affidavit showed actual prejudice because the trial judge's unqualified denials, which defied human experience, were falsely presented as an attempt to conceal the trial judge's "extra-judicial knowledge of members of the Basham family, one of whom is the alleged victim in this case, on account of their longstanding and intimate connections with [the trial judge's] children." However, it appears the newly-retained counsel formulated this serious claim against the trial judge based only on information available on the internet regarding the trial judge's adult children's cyber "friends" and connections. The trial judge's affidavit expressly stated the trial judge did not participate on his adult children's web pages and had no knowledge of their connections.

¶ 92          Although the information published on the internet may trigger further investigation, defendant's second motion did not assert newly-retained defense counsel made any effort to investigate the trial judge's personal knowledge of the information posted on the internet, which would require him to recuse himself from defendant's case. Further, the defendant's second motion for substitution for cause did not contain any allegations linking the trial judge to any information posted on his adult children's websites, such that knowledge of that information could be imputed to the trial judge. Such strong accusations against the judiciary, based solely on unverified details concerning a judge's adult children's access to information posted on

27

internet social websites, should be discouraged. Therefore, this court will not consider the conclusory, personal opinion of newly-retained defense counsel concerning the veracity of the contents of the trial judge's affidavit.

¶ 93   After careful review, we conclude the second motion for substitution does not allege the trial judge was personally aware of any of the extra-judicial information, posted on the internet or provided from any other sources, linking adult members of the judge's family to the Bashams. Unless the trial court was aware of any purported interaction between his family and the victim's family, it is difficult to imagine the trial judge could have become prejudiced by information that had not been shared with the trial judge. Further, the defense's second motion and its attachments do not allege facts showing the judge engaged in any discussion on any of the internet web pages submitted in support of the motion. Finally, we note the second motion for substitution did not point out any particular improper legal ruling by the trial court in support of a claim that the trial judge conducted himself in a less than fair and impartial manner at any time during the entire criminal proceeding.

¶ 94   Here, we conclude that the trial court's finding of guilty, standing alone, does not support the view that the trial judge bore any animosity, hostility, ill will, or distrust toward this defendant. Therefore, we affirm Judge Schoenstedt's orders dismissing both motions for substitution for cause because the pleadings were insufficient on their faces to demonstrate actual prejudice and did not merit an evidentiary hearing.

¶ 95                                  V. Sufficiency of the Evidence

¶ 96   On appeal, defendant argues the State's evidence was insufficient to prove she committed the offense of aggravated battery to a child beyond a reasonable doubt. The State submits there was sufficient evidence to prove defendant committed the charged offense.

28

¶ 97 Once a defendant has been found guilty of an offense and challenges the sufficiency of the evidence, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This court will not set aside a criminal conviction on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). It is not the function of this court to retry a defendant, and the determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. *Id.*

¶ 98 Defendant argues that the State's evidence was insufficient because the evidence failed to prove, beyond a reasonable doubt, the exact causation of O.D.'s injuries and that defendant inflicted those injuries. Viewing the evidence in the light most favorable to the State, the evidence showed that O.D. arrived at daycare on August 29, 2007, without a "goose egg" on his forehead or any head injury. The evidence demonstrated that O.D. was non-ambulatory and could not have inflicted his injuries on himself that day. Further, defendant admitted that she was present when O.D. "bumped" his head on the floor, that O.D. cried hard when he received the injury, that she placed an ice pack on his head to treat the injury, and that she called O.D.'s mother when the injury occurred. Defendant also testified she was the only adult in the home at the time and the two older children, age 2, were sleeping in their cribs. Further, O.D.'s mother testified that, during the second phone call, defendant told her that O.D. "was crying so hard he couldn't breathe when it happened," and asked the mother if it was normal for O.D. to "be sitting up sleeping in his high chair for about three hours?" Additionally, when mother arrived at

29

defendant's home, 45 minutes after the second phone call, she observed O.D. had a "pretty decent goose egg on his head," and Eileen Strejc arrived at the daycare at 3:45 p.m. on August 29, 2007, and also corroborated the fact that O.D. had a bump on his head and looked like he had been crying.

¶ 99        The medical evidence from the treating doctors was overwhelmingly in favor of the State. Dr. Voirin testified about the retinal hemorrhages in O.D.'s eyes and that they resulted from "non-accidental trauma," and did not result from O.D. "hitting his head reaching for a toy." Dr. Johnston described O.D.'s injury as an "acute subdural hematoma," which usually occurs when a young child is "dropped, thrown, ejected from a car, restrained in a high speed motor vehicle accident, some sort of rapid acceleration-deceleration blunt traumatic injury." Dr. Johnston stated the babysitter's explanation was not consistent with the injury. Dr. Saving, one of 200 doctors certified in child abuse pediatrics in the United States, testified to the multiple injuries on several planes of O.D.'s body, which was "very, very unusual" in a non-ambulatory child. Dr. Saving determined that a significant blunt-force impact at the point of O.D.'s "goose egg" caused his brain to bounce off the other side of O.D.'s skull to cause the subdural hematoma. Dr. Saving said, in her opinion, the totality of O.D.'s injuries were caused by "abusive head trauma or intentional traumatic brain injury." Dr. Savings further testified, based on a reasonable degree of medical certainty, that O.D.'s injuries were caused by abuse that occurred during the time he was at daycare on August 29, 2007.

¶ 100        We note defendant's expert, Dr. Plunkett, testified that O.D. had pre-existing extra axial fluid in his brain which could have caused a subdural hematoma even with an accidental slight bump to O.D.'s forehead. However, Dr. Saving refuted Dr. Plunkett by testifying it was her opinion the child did not have the pre-existing medical condition of benign extra-axial fluid of

30

infancy. She opined that the extra-axial fluid that appeared in O.D.'s MRI and CT scans was most likely a result of the extra fluid that normally occurs as the result of an injury.

¶ 101    In situations where medical experts are called to testify, their comparative credibility and the weight to be accorded to their testimony is determined by the trier of fact. *People v. Peterson*, 171 Ill. App. 3d 730, 734 (1988). Here, the trial judge found the testimony of several *treating* doctors was more persuasive than that of defendant's expert and concluded O.D.'s head injury did not result from accidental trauma caused by the child's own actions on August 29, 2007. Moreover, the treating medical experts agreed that some degree of force beyond that within an infant's capacity was required to cause these injuries, and that defendant's version of how the head injury occurred was not plausible.

¶ 102    Defendant contends the State did not prove she knowingly or intentionally harmed O.D., therefore, her conviction must be reversed. The element of intent or knowledge in a child abuse case is ordinarily established by circumstantial evidence rather than direct proof, especially without eyewitnesses or statements by a defendant regarding his or her direct actions. *People v. Lind*, 307 Ill. App. 3d 727, 735 (1999); *People v. Rader*, 272 Ill. App. 3d 796, 804 (1995). In child abuse cases, a "defendant need not admit knowledge for the trier of fact to find that the defendant acted knowingly." *Lind*, 307 Ill. App. 3d at 735. The necessary "intent may be inferred (1) from the defendant's conduct surrounding the act and (2) from the act itself." *People v. Phillips,* 392 Ill. App. 3d 243, 259 (2009).

¶ 103    The *Lind* case is similar to the case at bar. In *Lind*, the court found the evidence was sufficient to prove the defendant guilty where the four-month-old child's fatal injuries occurred when the defendant was alone with the child, the injuries required a substantial use of force, the injuries sustained were inconsistent with the defendant's explanation for the injuries, and the

31

medical experts testified that the injuries were non-accidental and consistent with either blunt force trauma or shaken baby syndrome. *Lind*, 307 Ill. App. 3d at 736; see also *People v. Renteria*, 232 Ill. App. 3d 409 (1992).

¶ 104    Here, the treating medical experts determined O.D.'s injuries were non-accidental and occurred as a result of a significant amount of force applied to the child's head. Further, there were several injuries to multiple planes of O.D.'s body, including the brain injury, that could not have been caused by O.D. himself at daycare on August 29, 2007. Defendant's explanation for how O.D. received the "goose egg" bump on his head was not consistent with the injuries O.D. incurred. Defendant was the only adult in the household and the only person with access to the child when O.D. "bumped" his head. Additionally, defendant telephoned mother admitting O.D. was injured while at daycare. Looking at all of the evidence in a light most favorable to the State, we conclude sufficient evidence was provided to the trial court to prove defendant guilty beyond a reasonable doubt of the offense of aggravated battery of a child.

¶ 105                                    CONCLUSION

¶ 106    For the foregoing reasons, we affirm the defendant's conviction for aggravated battery of a child.

¶ 107    Affirmed.